UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STRYKER CORPORATION, *et al.*,

        Plaintiffs,

v.

XL INSURANCE AMERICA, INC. and
TIG INSURANCE COMPANY,

        Defendants.

_____/

HON. ROBERT HOLMES BELL

File No. 1:05-CV-51


## **O P I N I O N**

This matter is before the Court on Plaintiff Stryker Corporation's motion, joined by

XL Insurance America,[1] for summary judgment against TIG Insurance Company (Dkt. Nos.

261, 280)[2] and on TIG's motion to bar or strike references to settlement negotiations (Dkt.

No. 295).  For the reasons that follow, both motions will be denied.

### I.

In 1998, Stryker purchased the assets and stock of Howmedica Osteonics Corp. from

---

[1] Stryker has raised several arguments in support of its motion for summary judgment.
XL's joinder, however, is limited to the issue of waiver of the "consent to settle" defense.
(Dkt. No. 300, XL Reply Br. at 1.)

[2] The Court will refer to *Stryker Corp v. XL Insurance America, Inc*., Case No. 4:01-
CV-157, *rev'd in part*, 681 F.3d 806 (6th Cir. 2012), as *Stryker I*, and to this case, *Stryker
Corp. v. National Union Fire Insurance Co. of Pittsburgh, PA*, Case No. 1:05-CV-51, *rev'd
in part*, 681 F.3d 819 (6th Cir. 2012), as *Stryker II*.

Pfizer, Inc. Howmedica was the manufacturer of the Duracon Unicompartmental Knee ("Uni-Knee" or "DUK"). In 2000, Stryker began receiving product liability claims regarding defective Uni-Knees ("DUK claims"). Stryker tendered these product liability claims and lawsuits arising out of defective Uni-Knees to XL, its insurer for the 2000 policy year. XL declined to defend or indemnify Stryker for the DUK claims. (Dkt. No. 54, Ex. I.) Stryker ultimately paid over $7,620,731.07 to settle the DUK claims. (*Stryker I*, Dkt. No. 1126, Ex. D, Settlement Chart.) In 2001, Stryker sued XL for defense and indemnification for the DUK claims against Stryker. *Stryker I*, Case No. 1:01-CV-157.

Pfizer, as the parent corporation of Howmedica, also received many Uni-Knee product liability claims. Pfizer prevailed in its suit against Stryker for indemnification for the Uni-Knee claims pursuant to a Stock and Asset Purchase Agreement and obtained an interlocutory judgment against Stryker in the amount of $17,710,428.34. *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 159 (S.D.N.Y. 2004).

In 2005 Stryker filed this complaint against XL and TIG, its excess insurer, seeking damages against XL for breach of contract, a declaration that XL was obligated to defend and indemnify Stryker in the *Pfizer* action, and a declaration that TIG is obligated to cover any losses from *Stryker I* and *Pfizer* that were not covered by XL. (Dkt. No. 70, Third Am. Compl.) This Court entered summary judgment in favor of Stryker against XL and TIG. (Dkt. No. 162.)

The Sixth Circuit has affirmed this Court's judgment in *Stryker I* that the XL policy

provided coverage for the DUK claims. *Stryker I*, 681 F.3d at 813, but reversed this Court's

determinations with respect to consequential damages and application of the Pfizer settlement

to XL's policy limits. The Sixth Circuit has affirmed this Court's ruling in *Stryker II* that this

case is not moot, but reversed this Court's ruling that TIG is precluded from raising coverage

defenses on remand. *Stryker II*, 681 F.3d at 826.

In 2009, XL settled with *Pfizer* and paid the *Pfizer* judgment. TIG filed an action

against Stryker and XL, seeking a declaration that the TIG policies were not at issue until the

limits of the underlying insurance were exhausted. *TIG Ins. Co. v. Stryker Corp.*, Case No.

1:09-CV-156 (*Stryker III*). This Court dismissed *Stryker III* based on its determination that

the claims raised in *Stryker III* should have been raised as compulsory counterclaims in

*Stryker II*. (*Stryker III*, Dkt. Nos. 30, 31.)

The current motion concerns Stryker and XL's contentions that TIG has no defenses

against Stryker's claim that TIG is liable, under its excess policy, to pay Stryker's settlements

of the direct DUK claims.

## II.

Before turning to the motion for summary judgment, the Court will consider TIG's

challenge to the evidence that has been presented by XL in support of the motion for

summary judgment. TIG moves to strike "references to conduct and statements during

settlement negotiations." (Dkt. No. 295, TIG's Mot. to Strike.) Specifically, TIG seeks to

exclude evidence that TIG refused to participate in the settlement conference or to contribute

to any settlement of any Uni-Knee-based claims because such claims were not covered under its excess policy. (Dkt. No. 280, XL Br. p.2 first bullet point, p. 5, 2nd ¶, & Attach. 1, Betz Decl. ¶ 3.)

TIG challenges XL's references to conduct and statements made during settlement negotiations because they are not admissible under Rule 408 of the Federal Rules of Evidence. Rule 408 provides that "conduct or a statement made during compromise negotiations about the claim" is not admissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). There is a "strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003). "In order for settlement talks to be effective, parties must feel uninhibited in their communications." *Id.* Rule 408, however, does not bar all communications made during settlement. By its terms, it applies only to "conduct or a statement made during compromise negotiations about the claim." Fed. R. Evid. 408(a)(2). "Rule 408 excludes only evidence of conduct and statements made solely as part of the settlement negotiations, and not statements and conduct made at the meeting which are unrelated to such compromise negotiations." *Trans Union Credit Info. Co. v. Assoc. Credit Servs., Inc.*, 805 F.2d 188, 192 (6th Cir. 1986). "[T]he purpose of the settlement privilege is to keep the give and take of proposed settlement negotiations secret." *State v. Little River Band of Ottawa Indians*, 5:05-CV-95, 2007 WL 851282, at *3 (W.D. Mich. Mar. 16, 2007)

(Brenneman, M.J.). "The strong public interest favoring secrecy of matters discussed by parties 'during settlement negotiations,' does not extend with equal force to discussions about the prospect or existence of settlement negotiations." *Id.* at *2 (citing *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir.2003)). As the Sixth Circuit noted in *Goodyear*, even though Rule 408 bars the admissibility of settlement *communications*, its exceptions have been used to admit the *occurrence* of settlement talks. 332 F.3d at 981.

The evidence TIG seeks to exclude simply discloses that TIG declined to participate in a settlement conference on the ground that it owed no coverage. TIG's decision not to participate in settlement negotiations is not the type of communication that the Rule is designed to protect. Moreover, TIG's communication that it owed no coverage was not secret; it had made this position known in its prior public pleadings. (*See, e.g.*, Dkt. No. 66, TIG Answ. to 2nd Am. Compl. Affirm. Defenses.) The evidence TIG seeks to exclude is not "conduct or a statement made during compromise negotiations about the claim," and does not fall within the scope of Rule 408(a).

Moreover, even if the communications did fall within the scope of Rule 408(a), the Rule only prohibits use of the evidence "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. The Rule expressly provides that "conduct [and] statements made in compromise negotiations" are nevertheless admissible if used for a purpose other than one of those

5

expressly prohibited by the Rule. Fed. R. Evid. 408(b). "The exception clearly intends to exempt from the absolute prohibition of the Rule evidence focused on issues different from the elements of the primary claim in dispute." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 114 (2d Cir. 2008) (holding that statements made in settlement negotiations were admissible to prove estoppel); *see also Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dept. of Educ.*, No. 5:06-CV-139, 2007 WL 2986469, at *2 (W.D. Mich. Oct. 10, 2007) (Quist, J.) ("As the language of the rule makes clear, however, evidence pertaining to settlement terms or negotiations is admissible when it is offered for another purpose unrelated to the validity or amount of a claim.").

XL contends that it has offered the challenged evidence for "another purpose," namely, "to demonstrate that TIG's denial of coverage constituted a waiver of its entitlement to assert a consent-to-settle defense." (Dkt. No. 298, XL Br. 13.) XL also contends that when TIG took the position that there was no coverage for the DUK claims because Stryker did not seek TIG's consent prior to settlement, TIG "opened the door" to evidence challenging the merits of its position.

The exceptions to Rule 408 have been held to allow evidence of waiver. *See*, *e.g.*, *Thomas & Marker Const., Co. v. Wal-Mart Stores, Inc.*, 3:06-CV-406, 2008 WL 5119587 (S.D. Ohio Nov. 30, 2008) (holding that offer was admissible if offered as evidence of waiver, and not to prove liability for, invalidity of, or amount of a claim); *Griggs v. Allstate Ins. Co.*, No. C-3-96-48, 1997 WL 1764777 (S.D. Ohio Sept. 15, 1997) (holding that offer

6

to pay for loss was admissible as evidence of waiver of the limitations period). The exceptions have also been held to allow evidence of estoppel. *See*, *e.g.*, *PRL USA Holdings*, 520 F.3d at 114 (holding that statements made in settlement negotiations were admissible to prove estoppel).

XL has not introduced the challenged evidence to prove or disprove the validity of Stryker's claim against TIG, but to show that TIG had notice and an opportunity to participate in the Pfizer settlement in order to counter TIG's assertion that Stryker was required to obtain TIG's prior consent to a settlement. The Court is satisfied that whether this is viewed as a waiver or an estoppel argument, XL is offering the challenged evidence for "another purpose" that is not barred by Rule 408.

TIG has also moved to strike Mr. Betz's declaration pursuant to Rule 56(c)(4) because his statements are not based on his personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). TIG contends that while the declaration implies that Mr. Betz had personal knowledge of the matters contained in the declaration, there is no clear assertion that Mr. Betz has personal knowledge of the referenced conduct and statements. This argument lacks merit. Mr. Betz attended both days of the settlement conference. (Dkt. Nos. 164, 165, Minutes.) For purposes of a summary judgment motion, "[t]he proffered evidence need not be in admissible form, but its content

must be admissible." *Perry v. Jaguar of Troy*, 353 F.3d 510, 516 n.3 (6th Cir. 2003) (citing *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)).  The Court is satisfied, based on Mr. Betz's declaration and the public record of his presence at the settlement conference, that he has personal knowledge of the matters contained in his declaration and would be competent to testify to them.  Accordingly, TIG's motion to bar or strike references to settlement negotiations will be denied.

## III.

Stryker moves for summary judgment against TIG on the issue of liability.  Stryker contends that TIG has no defenses to Stryker's contention that TIG is liable for the settlement payments Stryker has made that are in excess of the XL policy.  The focus of this motion is on TIG's contention that it does not owe insurance benefits to Stryker for the direct DUK claims because Stryker did not obtain TIG's written consent to enter into settlements of the direct DUK claims.

### A.  RIPENESS

In its initial response brief, TIG argued that the motion for summary judgment is premature because it has not yet been established that the XL Policy has been exhausted. (Dkt. No. 268, TIG Br. 1.)  After TIG filed its brief, this Court entered its order of February 8, 2013, which specifically declared that XL has exhausted its policy limits.  (Dkt. No. 305, Op.)  Although there may still be some dispute as to the exact amounts Stryker is claiming from TIG, Stryker's motion is directed only to the issue of liability, and not to the issue of

damages. Accordingly, the Court finds that the issue is ripe for determination.

## B. DEFENSES UNIQUE TO THE TIG POLICY

Stryker contends that pursuant to the Sixth Circuit's opinion, TIG may only raise coverage defenses that are unique to its policy, and that TIG has no such defenses. Stryker is mistaken on both points.

The Sixth Circuit did not limit TIG to coverage defenses that are unique to its policy. The Sixth Circuit held that "TIG is not in privity with XL, and is not precluded from raising its own defense to coverage on remand." *Stryker II*, 681 F.3d at 825. Although the Sixth Circuit noted that it did "not mean to suggest that the district court should interpret the portion of the TIG policy that incorporates the XL language differently from the interpretation of the XL policy itself," and further noted that TIG policy provisions that do not incorporate language from the XL policy "might generate coverage defenses that are unique to the TIG policy," 681 F.3d at 825 n.4, this language does not suggest that TIG is prohibited from arguing for a different interpretation of the XL policy or to raising only defenses that are unique to its policy.

Stryker's contention that TIG has no defenses other than the defenses XL has raised is based on the fact that the TIG policy is a "follows form" policy. A "follows form" policy is simply one that insures the same risks covered by the underlying policy. *See N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995) (holding that a "following forms" provision typically limits the reinsurance to the terms and conditions of the

underlying policy and provides that the reinsurance certificate will cover only the kinds of liability covered in the original policy issued to the insured); *Hartford Acc. & Indem. Co. v. Chi. Hous. Auth.*, 12 F.3d 92, 95 (7th Cir. 1993) (holding that a "following form" policy "insures the same risks covered by the underlying policy . . . but provides coverage to the insured in addition to and in excess of the coverage provided by" the underlying policy). The TIG policy follows-form to the underlying XL policy inasmuch as it insures against the same risks. That does not mean that the TIG policy cannot include conditions of coverage that differ from those of the underlying XL policy. In fact, the TIG policy expressly provides that the definitions, terms, conditions, limitations and exclusions of the underlying insurance apply "unless they are inconsistent with the provisions of this policy . . . ." TIG Policy § IA. The Court cannot find, as a matter of law, that TIG does not have any defenses that are unique to its policy.

## C.    "CONSENT TO SETTLE" DEFENSE

In the course of this litigation TIG has asserted that it does not owe Stryker coverage for amounts Stryker paid to settle direct DUK claims because settlement payments made without TIG's prior consent do not constitute Ultimate Net Loss under the TIG policy. The heart of Stryker and XL's summary judgment motion is directed at the "consent to settle" defense. Stryker and XL contend that this defense fails under the language of the TIG policy, or that it has been waived.

The TIG excess umbrella policy provides for coverage as follows:

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of occurrences insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

The Definitions, Terms, Conditions, Limitations, and Exclusions of the "first policy of UNDERLYING INSURANCE," in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with the provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

(Dkt. No. 70, 3rd Am. Compl., Ex. G, TIG Policy at 12; Dkt. No. 268, TIG Br. at 5.)

The TIG policy defines ULTIMATE NET LOSS as follows:

ULTIMATE NET LOSS means the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with the written consent of US, after making proper deduction for all recoveries and salvages.

Defense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE.

(TIG Policy 14.)

The definition of Ultimate Net Loss is part of the words of coverage. Accordingly, Stryker bears the burden of proof on whether a particular settlement is included in Ultimate Net Loss. *See Tooling Mfg. & Tech. Ass'n v. Harford Fire Ins. Co.*, 693 F.3d 665, 671 (6th Cir. 2012) ("[T]he insured has the burden to demonstrate that its claim falls within the terms of the policy.") (citing *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 510 (Mich. 1995)).

1. **Construction of the Policy**

Movants contend that construing the policy to require the insured to obtain the consent of an excess insurer before settling within primary limits is unreasonable and would produce absurd results. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 545 (6th Cir. 2007) ("[C]ontracts must be construed consistent with common sense and in a manner that avoids absurd results . . . ."). Movants contend that it is unreasonable to require the insured to obtain the excess insurer's consent to settlements that do not implicate the excess insurer's policy because it would subject the right to settle within primary limits to the whims of the excess insurer.

The Court does not agree that TIG's construction of the policy would produce absurd results. Movants' position is based on the assumption that Stryker's settlements within XL's limits did not implicate the excess policy. That assumption is not correct. The TIG policy clearly provides only for payment of Ultimate Net Loss, which is defined to include only settlements which have been entered into with TIG's written consent. The TIG policy does not exclude the consent requirement for settlements within the underlying policy limits. It is neither unreasonable nor absurd for an excess insurance policy to require the insured to obtain consent to settlements that the insured might in the future want to include in the calculation of the Ultimate Net Loss. Even settlements that are within the underlying insurance limits implicate the excess insurer's policy if there is any possibility that the underlying insurance will be exhausted. The insured is in the best position to know its

potential exposure, and if it wants to preserve its potential right to excess insurance, it is not unreasonable or absurd to require it to consult with the excess insurer.

Movants' unreasonableness argument is based on the fear that the excess insurer will exercise its right to consent to scuttle a settlement that is within the primary insurer's limits. The Court is not prepared to assume that the excess insurer would unreasonably withhold its consent to a settlement that is within the primary insurer's limits, or that an unreasonable withholding of consent could not be addressed when the issue of Ultimate Net Loss arose.

In support of its argument that TIG's construction is absurd, Stryker contends that TIG has admitted that Stryker did not need TIG's consent to settle the claims against Stryker. (Dkt. No. 321, Stryker Supp. Br. 6.) This is not a correct interpretation of counsel's statements on the record. The Court asked counsel for TIG whether TIG had "an interest in the first settlement for $100,000 because that's part of the add-on that gets you up to where you may have to kick in everything above" (i.e., the Ultimate Net Loss). (Dkt. No. 320, Tr. 18.) Counsel for TIG responded that TIG had an interest in the early settlements, but TIG did "not have a right to deny consent to a settlement that Stryker proposes to make within the limits of the XL policy." (*Id.*) Counsel's representation that TIG would not have withheld consent for a settlement within XL's policy limits is not an admission that Stryker did not need TIG's consent to settle the claims if it wanted them included in the calculation of Ultimate Net Loss. Counsel for TIG did not suggest that TIG does not have a right under the policy to insist on the opportunity to review and consent to the settlement. TIG's

representation that it would not have denied consent may factor into a consideration of whether the lack of notice caused TIG prejudice, but the question of prejudice is not currently before the Court and, in any event, raises factual issues that would preclude a ruling on summary judgment.

Stryker also contends that TIG has admitted that Stryker acted reasonably in settling the direct claims without TIG's consent. (Dkt. 321, Stryker Supp Br. 6.)[3]  TIG's concession that Stryker acted reasonably under the circumstances does not suggest that TIG has admitted that TIG's "consent to settle" requirement is unreasonable.  In fact, as TIG noted in the same brief:

> However, the definition of Ultimate Net Loss in the TIG Policy cannot be read to bring within its scope settlements not consented to by TIG if Stryker believes another insurer is responsible.  There is no such language in the Ultimate Net Loss definition and no basis for reading into the TIG Policy such an expansion of coverage.  There simply can be no misunderstanding that the TIG Policy provides coverage only for Ultimate Net Loss and that amounts paid on settlements not entered into with the written consent of TIG do not constitute Ultimate Net Loss.

(*Stryker I*, Dkt. No. 1188, TIG Br. pp 14-15.)

The Court cannot find, as a matter of law, that it is unreasonable or absurd to apply a "consent to settle" requirement to settlements entered into before the underlying policy limits have been exhausted.  The Court also disagrees with Stryker's contention that TIG has conceded that the provision is unreasonable or absurd.

---

[3] Stryker relies on the following statement by TIG:  "It is apparent that Stryker did not seek consent from TIG for its settlements because it believed XL (and initially National Union) to be responsible for those settlements. . . . This was certainly a reasonable view and one later confirmed by rulings in Stryker I." (*Stryker I*, Dkt. No. 1188, TIG Br. 14.)

## 2. **Waiver**

### a. By Failing to Give Notice

Movants contends that TIG waived its "consent to settle" defense by failing to give Stryker notice of the defense in the seven years that this litigation has been pending or in the twelve years since TIG received notice of the first Uni-Knee claims.

An insurer waives conditions to coverage when the insurer fails to give reasonable notice to the insured that it is invoking them or reserving the right to do so. *City of Sterling Heights v. United Nat. Ins. Co.* 319 F. App'x 357, 365 (6th Cir. 2009); *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 257 F.3d 484, 498 (6th Cir. 2001) (finding waiver where an insurer slept on a defense for nearly 10 years and raised it only after other defenses failed).

In its first pleading in this case, TIG asserted as an affirmative defense: "The purported claims against Plaintiffs have not and will not result in ULTIMATE NET LOSS as defined by the subject TIG policies, and, therefore, the Insuring Agreements of the subject TIG policies have not been satisfied." (Dkt. No. 7, TIG Affirm. Def. ¶ 5.) TIG has maintained this defense throughout this case. (Dkt No. 66, TIG Affirm. Def. ¶ 5; Dkt. No. 82, TIG Affirm. Def. ¶ 5.) Because the policy defines Ultimate Net Loss as the amount paid in settlement or satisfaction claims "with the written consent" of TIG, TIG's "consent to settle" defense is part and parcel of its "Ultimate Net Loss" defense. Accordingly, Movants are not entitled to a ruling that TIG waived the "consent to settle" defense by failing to give notice.

b. <u>By Denying Coverage</u>

Movants also contend that TIG waived its "consent to settle" defense by denying coverage. Under Michigan law, "[w]hen an insurer breaches its own policy of insurance by refusing to fulfil its duty to defend the insured, the insurer is bound by any reasonable settlement entered into in good faith between the insured and the third party." *Alyas v. Gillard*, 446 N.W.2d 610, 613 (Mich. Ct. App. 1989) (citing *The Detroit Edison Co. v. Mich. Mut. Ins. Co.*, 301 N.W.2d 832, 836 (Mich. Ct. App. 1980)). "An insured is released from any agreement not to settle without the insurer's consent where the insurer has denied liability and wrongfully refused to defend." *Id.* (citing *Giffels v. The Home Ins. Co.*, 172 N.W.2d 540, 544 (Mich. Ct. App. 1969)).

The TIG policy states that "if any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss." (TIG Policy 12.) Stryker contends that because XL denied coverage, TIG also denied coverage pursuant to the terms of the TIG policy. Stryker contends that in light of this denial, Stryker is released from the "consent to settle" requirement, and TIG is bound by the reasonable settlements Stryker entered into in good faith.

Nothing in the TIG policy delegates to XL authority to accept or deny coverage under the TIG Policy. Moreover, Stryker has provided no case authority for imputing XL's denial of coverage as a denial of coverage by TIG. Because TIG arguably has defenses to coverage that are unavailable to XL, XL's denial of coverage does not automatically release Stryker from the "consent to settle" requirement.

Movants both contend that TIG denied coverage when it denied the allegation in Stryker's complaint that "TIG has an obligation to cover any loss in excess of the primary umbrella policies, up to the limits of the TIG policy." (Dkt. No. 1, Compl. ¶ 33; Dkt. No. 7, TIG Answ. ¶ 72.) Movants further contend that TIG confirmed its denial of coverage when it refused to participate in the settlement conference or to contribute to any settlement of any Uni-Knee-based claims because such claims were not covered under its excess policy. (*See Stryker II*, Dkt. No. 280, Betz Decl. ¶ 3.) Such evidence of TIG's denial of coverage occurred after Stryker had settled most of the DUK claims. The evidence accordingly has little bearing on whether TIG waived its right to enforce the "consent to settle" provision at the time Stryker entered into the settlements of the direct DUK claims.

There is no real dispute that an excess insurer can, by its actions, waive its ability to demand compliance with its written consent requirement. *See*, *e.g.*, *Gen. Star Nat. Ins. Co. v. Universal Fabricators, Inc.* 427 F. App'x 32, 34 (2d Cir. 2011) (holding that excess insurer had relinquished its ability to demand compliance with its policy provision requiring written consent to a compromise agreement by telling its primary insurer to handle the matter as it saw fit). However, the issue of waiver based on denial of coverage is not ripe for summary judgment. The record is silent as to what communications Stryker did or did not have with TIG prior to entering into the settlements. There are issues of fact that need to be fleshed out before the issue of waiver of the right to enforce the "consent to settle" provision can be determined.

c. <u>By Judicial Admissions</u>

Movants contend that TIG waived its "consent to settle" defense through its lawyer's representations to the Court. In support of this argument, Movants point to three occasions where TIG's lawyers stated that coverage under the TIG policy turns solely on whether the XL policy provides coverage.

Movants rely on the following statements by TIG's counsel:

1. At the August 20, 2007, Rule 16 Conference, counsel for TIG agreed with the Court that it was "fair to say that except for this prior knowledge defense [under the 1999 policy] that might be separate, that TIG's liability issues stand or fall with the first level of coverage."

(Dkt. No. 72, Tr. at 8.)

2. In a March 24, 2008, brief, TIG's counsel stated that "the coverage issues presented as to whether coverage under the TIG policy is triggered in this case turn solely on interpretation of the underlying 2000 XLIA Policy."

(Dkt. No. 107, TIG Br. at 3.)

3. In a September 15, 2008, motion, TIG stated: "Thus, this Court's interpretation of the definitions, terms, conditions, limitations and exclusions of the underlying 2000 XLIA policy determines whether the TIG Policy can be implicated by the Uni-Knee cases."

(Dkt. No. 154, TIG Mot. at 2.)

"Statements of an attorney that are directly related to the litigation at hand have been held to be within the attorney's scope of authority and binding on the client." *United States v. Johnson*, 752 F.2d 206, 210-11 (6th Cir. 1985). However, "[i]n order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous."

*MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997); *see also  Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (noting that "legal conclusions are rarely considered to be binding judicial admissions").

The statements relied on are not unambiguous.  All of the representations were made before XL exhausted the underlying policy by settling the Pfizer action in February 2009. At the time the statements were made, both Stryker and TIG anticipated that XL would cover Stryker's settlements of the direct DUK claims.  There is nothing in the record to suggest that these statements were made with the intention of relinquishing the "consent to settle" requirement.  Stryker cited these same statements in support of its argument before the Sixth Circuit that TIG had admitted that its liability turned solely on the XL policy.  (*Stryker II* Appeal, Doc.: 006111072871, Stryker Br. *passim*.)  The Sixth Circuit nevertheless found that TIG "is not precluded from raising its own defenses to coverage on remand."  681 F.3d at 825.  This Court concludes that TIG did not waive its "consent to settle" defense through its lawyer's representations to the Court.

## D.  CLAIM PRECLUSION

Stryker also moves for summary judgment on the basis that TIG is barred from raising claims or defenses it could have raised in *Stryker III*.  Stryker contends that TIG was obligated to assert all of its defenses to coverage when it sought a declaratory judgment against Stryker in *Stryker III*.  *Stryker III* was dismissed, and TIG failed to appeal the dismissal.  As a result, Stryker contends that principles of claim preclusion bar TIG from asserting any coverage defenses.

19

As a general rule, "[c]laim preclusion applies not only to bar the parties from relitigating issues that were actually litigated but also to bar them from relitigating issues that could have been raised in an earlier action." *J.Z.G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir. 1996). Although TIG might technically have been able to raise the issue of its duty to cover Stryker's settlements of the direct DUK claims in *Stryker III*, this Court finds that Stryker's preclusion argument appears to be foreclosed by the Sixth Circuit's opinion in *Stryker II*. The Sixth Circuit ruled that because TIG was not in privity with XL, TIG is not bound by the rulings in *Stryker I*, and "is not precluded from raising its own defenses to coverage on remand." 681 F.3d at 825. Before arriving at this determination, the Sixth Circuit considered the effect of *Stryker III*. The Sixth Circuit held that "claims raised by TIG in the *Stryker III* action are subject to claim preclusion and TIG is barred from relitigating them." 681 F.3d at 824. As an example, the Sixth Circuit noted that because TIG raised the issue of allocation of losses between the 1999 and 2000 policy periods in *Stryker III*, TIG could not raise the issue again on remand. *Id.* at 824-25. The Sixth Circuit followed this with the statement that "[w]ith regard to potential defenses not previously raised by TIG, issue preclusion does not apply." *Id.* at 825. The Court concludes from the language of the Sixth Circuit's opinion in *Stryker II* that TIG is not precluded from raising issues on remand that were not raised in *Stryker III*, even if an argument can be made that the defenses could technically have been raised there.

**III.**

For the reasons stated, Stryker's motion, joined by XL, for summary judgment against TIG (Dkt. Nos. 261, 280), and TIG's motion to bar or strike references to settlement negotiations (Dkt. No. 295) will both be denied.

An order consistent with this opinion will be entered.


Dated: June 27, 2013                                    /s/ Robert Holmes Bell
                                                        ROBERT HOLMES BELL
                                                        UNITED STATES DISTRICT JUDGE