UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

                Plaintiffs,              Case No. 1:05-cv-51

v.                                HON. ROBERT HOLMES BELL

XL INSURANCE AMERICA,
INC. and TIG INSURANCE
COMPANY,

                Defendants.

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TIG INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     STATEMENT OF THE FACTS ....................................................................... 4

      A.      The Pfizer Howmedica Acquisition......................................................... 4

      B.      Stryker's Acquisition and Distribution of Stale Inventory and
              Resulting Claims...................................................................................... 4

      C.      Stryker's Notice to TIG of the Post-Closing Claims and Settlements ................... 5

      D.      The Pfizer Indemnification Claim and Stryker's Failure to Inform TIG of
              that Claim................................................................................................ 6

      E.      The Pfizer Suit and Stryker's Failure to Provide TIG Key Documents
              Related to that Suit ................................................................................. 8

      F.      December 2003 – The Actual Losses for Post-Closing Claims Exceed
              TIG's Attachment Point ........................................................................ 13

      G.      Stryker's Communications with TIG Following the Adverse Summary
              Judgment Result in the Pfizer Litigation and Its Filing *Stryker II* ......... 13

III.    PROCEDURAL HISTORY OF THE CASE .................................................... 16

IV.     STATEMENT OF THE ISSUES PRESENTED................................................. 19

V.      ARGUMENT ............................................................................................... 20

      A.      TIG's Motion For Summary Judgment Should Be Granted Because the
              Subject Claim Settlements (Entered Into Without TIG's Consent) Do Not
              Constitute Ultimate Net Loss And There Is No Legal Justification For
              Not Enforcing The Consent Requirement In This Case ........................... 20

            1.      The Scope of Coverage for Claim Settlements under the TIG Policy......... 20

            2.      Proof of Prejudice is Not Required under Michigan Law to
                Enforce the Policy's "Consent to Settle" Requirement .............................. 24

             3.      There Are No Legal Justifications for Not Enforcing the
                Consent Requirement.................................................................................. 25

B.    TIG's Motion For Summary Judgment Should Be Granted Because Stryker Breached Condition F. Of The TIG Policy By Failing To Provide It With Documents Related To The Pfizer Indemnification Claim And Pfizer Litigation, Resulting In A Lost Opportunity For TIG To Associate In That Claim And Suit ............................................................................... 32

1.    Stryker's Duties in the Event of a "Claim or Suit" ..................................... 32

2.    Stryker's Breach of Condition F. Duties ....................................... 33

3.    TIG Was Prejudiced by Stryker's Breach of Condition F. .......................... 34

VI.    CONCLUSION ............................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Aetna Case & Surety Co. v. Dow Chem. Co.*, 10 F.Supp.2d 800, 813 (E.D. Mich. 1998) ............. 35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ........................................... 20

*Barber v SMH (US), Inc.*, 202 Mich. App. 366, 376; 509 N.W.2d 791 (1993) .............................. 27

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) .................................................. 20

*Cincinnati Ins. Co. v. Bott*, 2005 WL 3018030 (Mich.App. Nov. 10, 2005) (unpublished) ........... 29

*City of Three Rivers*, 290 N.W. 390, 391-92 (Mich. 1940) ................................................ 32

*Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ................ 26

*Commercial Union Ins. Co. v. Med. Protection Co.*, 426 Mich. 109, 119, 393 N.W. 499
(1986) .................................................................................................. 36

*Detroit Water Team Joint Venture v. Agricultural Insurance Company*, 371 F.3d 336, 341
(6th Cir. 2004) ........................................................................................ 24

*Dupuis v. Utica Mut. Ins. Co.*, 2006 WIL 1084336 at *7 (Mich. App. 2006) (unpublished) .......... 21

*Giffels v. Home Ins. Co.*, 19 Mich. App. 146, 172 N.W. 540 (Mich. App. 1960) .......................... 21

*Henne v. Glens Falls Ins. Co. of Glens Falls, NY*, 222 N.W. 731 (Mich. 1929) ........................... 32

*Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 855 (Ill. App. Ct. 1993) ................................. 30

*Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 899 F. Supp. 498, 501 (D. Or. 1995),
*aff'd sub nom* ......................................................................................... 30

*Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234 (9th Cir. 1998) .... 30

*Kirschner v. Process Design Assoc.*, 459 Mich. 587, 592 N.W.2d 707 (1999)………………..29, 31

*Lee v. Auto-Owners Ins. Co.*, 218 Mich. App. 672, 674, 554 N.W.2d 610 (Mich. App. 2009) ...... 21

*Lee v. Evergreen Regency Coop.*, 390 N.W.2d 183 (Mich. App. 1986) ......................................... 31

*MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997) ........................................... 26

*Marrero v McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 442; 505 N.W.2d 275 (1993) ........................................................................................................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ............................... 20

*Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) ................... 20

*Montgomery Ward & Co. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. App. Ct. 2001) .............. 30

*Moore v. First Security Casualty Co*, 224 Mich. App. 370, 568 N.W.2d 841 (1997) .................... 29

*Philadelphia Indem. Ins. Co. v. Barerra*, 998 P.2d 1064, 1069 (Ariz. Ct. App. 1999) .................. 30

*Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (Mich. 1920) ......................................... 31, 32

*Ruddock* and *Ames v. Auto Owners Ins. Co.*, 195 N.W. 686 (Mich. 1923) ..................................... 32

*State Farm Fire & Cas. Co. v. Jioras*, 29 Cal. Rptr. 2d 840, 844 (Cal. Ct. App. 1994) ................ 30

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989) ......................................... 20

*Stryker Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 806 (6th Cir. 2012) ............ 18

*Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 470, 761 N.W.2d 846 (Mich. App. 2008) .................................................................................................. 21, 24, 28, 35

*Tooling Mfg. & Tech. Ass'n. v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012) ...... 22, 28

*Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ............................................................................................................. 28

*Wehner v. Foster*, 331 Mich. 113, 120-122, 49 N.W.2d 87 (1951) ............................................. 35

*Wells v. Prudential Ins. Co. of America*, 214 N.W. 308, 309 (Mich. 1927) .................................... 32

*West Am. Ins. Co. v. Meridian Mut. Ins. Co.*, 230 Mich. App. 305, 310, 583 N.W.2d 548 (1998) ............................................................................................................... 28

*West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036-1037 (6th Cir. 1990) ....................................................................................... 35, 36

**<u>Rules</u>**

Fed. R. Civ. P. 8.8(a)(2) ................................................................................................ 28

Fed. R. Civ. P 56(c) ...................................................................................................... 20

**<u>Other Authorities</u>**

4-24 *Appleman on Insurance* § 24.04 [3][a] ............................................................... 30

## I.     **PRELIMINARY STATEMENT**

This coverage dispute boils down to two questions – (i) whether the TIG policy's coverage is limited to claims settlements (no matter when made) that are consented to by TIG and (ii) whether Stryker breached a condition of the TIG policy by failing to provide TIG the legal papers it received related to the Pfizer claim and suit, resulting in a lost opportunity for TIG to associate in that claim and suit.  If the answer to either of these questions is "yes," there is no coverage in this case.  (Stryker believes the issues also include forms of waiver and/or estoppel, which justify the Court not applying the "consent to settle" limitation to coverage in this case. As discussed hereafter, those issues are distractions given that such theories cannot act to expand coverage under Michigan law).

Just over a year ago, this Court examined the first of the core questions in the context of Stryker's motion for summary judgment on TIG's liability.  In that opinion, the Court addressed Stryker's argument that the consent requirement "fails under the language of the TIG policy," stating:

> The definition of Ultimate Net Loss is part of the words of coverage. Accordingly, Stryker bears the burden of proof on whether a particular settlement is included in Ultimate Net Loss. [citation omitted].
>
> [Stryker] contend[s] that construing the policy to require the insured to obtain the consent of an excess insurer before settling within primary limits is unreasonable and would produce absurd results. [citation omitted] …The Court does not agree that TIG's construction of the policy would produce absurd results.  [Stryker's] position is based on the assumption that Stryker's settlements within XL's limits did not implicate the excess policy.  That assumption is not correct.  The TIG policy clearly provides only for payment of Ultimate Net Loss, which is defined to include only settlements which have been entered into with TIG's written consent.   The TIG policy does not exclude the consent requirement for settlements within the underlying policy limits.  It is neither unreasonable nor absurd for an excess insurance policy to require the insured to obtain consent to

1

> settlements that the insured might in the future want to include in the calculation of the Ultimate Net Loss.
>
> …The insured is in the best position to know its potential exposure, and if it wants to preserve its potential right to excess insurance, it is not unreasonable or absurd to require it to consult with the excess insurer.

(Dkt. 327, pp. 12-13).  Nothing that has transpired since the Court's opinion last summer should change this Court's views, as articulated above.  The meaning of the Ultimate Net Loss provision is plain and nothing in the TIG Policy provides an exception to its application in this case.  Accordingly, as a matter of law, Stryker's claims do not constitute Ultimate Net Loss under the TIG Policy.

The Court also addressed Stryker's various arguments that TIG had waived the right to assert the "consent to settle" requirement as a defense in this action. (*Id*. at 15-19).  In its opinion, the Court rejected all but one of Stryker's arguments.  That argument was defined as "whether TIG waived its right to enforce the "consent to settle" provision at the time Stryker entered into the settlements of the direct DUK claims." (*Id*. at 17).  As to that argument, the Court indicated that because "the record [was] silent as to what communications Stryker did nor did not have with TIG prior to entering into the settlements," fact issues needed to be "fleshed out." (*Id*.).

After a year of discovery, we now know the answer.  TIG said nothing in its communications with Stryker prior to the settlements that would establish a waiver (i.e., intentional relinquishment of a known right) of the consent requirement.  Perhaps facing this hard truth, Stryker has belatedly asserted that TIG's silence, during the time it knew Stryker was settling the underlying claims, reasonably induced it to believe that TIG "impliedly consented" to the settlements.  However, even if timely raised, this theory fails as a matter of law.  Indeed, as

2

an excess insurer with no duty to defend, TIG cannot be estopped from raising its defenses because it had no duty to speak (i.e., raise coverage defenses) at any time during the period in which Stryker was settling the underlying claims.  This is true even if TIG believed the claims would impact its layer, which it did not.  Moreover, as noted above, even if proven, a waiver or estoppel cannot act to expand coverage under Michigan law.

Discovery has unearthed other facts which establish another reason (beyond the consent requirement) that there is no coverage under the TIG Policy.  Those facts reveal that Stryker kept TIG in the dark about the extent of its DUK-related liabilities and more specifically, its unilateral decision in 2001 to not accept responsibility for all Post-Closing Claims and hold Pfizer harmless from such claims, as was required by the parties' acquisition agreement.  Instead, Stryker (unbeknownst to TIG) took the unreasonable position to "go to war" with Pfizer over those claims.  That decision (doggedly carried out over a period of four years) resulted in an escalation of Stryker's liabilities by millions of dollars beyond the sums needed to resolve the actual claims.  Of course, XL's settlement of those liabilities ultimately was deemed to have exhausted the XL policy's $15 million limits beneath TIG's policy, giving rise to Stryker's current coverage claim against TIG.  Stryker's actions constitute a breach of the TIG Policy, and TIG was prejudiced when it lost its opportunity to associate in the Pfizer claim, and later the Pfizer suit, and weigh in on Stryker's unyielding decision not to accept responsibility for all Post-Closing Claims.

Given the foregoing, as a matter of law, TIG has no obligation to provide coverage to Stryker for the underlying claim settlements.

## II.     STATEMENT OF THE FACTS

### A.     The Pfizer Howmedica Acquisition

The genesis of this case derives from Stryker's business decision in the summer of 1998 to acquire Pfizer's Howmedica division, which propelled Stryker to "become[] one of the largest players in the orthopedic implant business" and "a leader in the worldwide medical technology implant marketplace." (Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Def. S.F."), ¶¶ 1-4). Today, Stryker considers the decision to be "the single biggest business decision in the Company's history." (Def. S.F., ¶ 4).

While the decision has proven enormously beneficial to the Company, it was not achieved without risk.  Indeed, the nearly $2 billion deal came together in a matter of weeks as part of a bidding process against several competitors, with Pfizer dictating the deal terms in a pre-packaged acquisition agreement. (Def. S.F., ¶ 5). Stryker was able to negotiate some of the terms, but nonetheless agreed to assume extraordinary liability risks as part of the deal it executed. (Def. S.F., ¶ 6). Most notably, these risks included Stryker assuming liability for any and all claims arising from hundreds of thousands of pieces of time-sensitive, medical implant products it would be acquiring, while at the same time expressly waiving all UCC-type warranties (including the warranties of merchantability and fitness) with respect to those products. (Def. S.F., ¶ 6).  In addition, Stryker agreed to indemnify and hold Pfizer harmless from all post-closing claims. (Def. S.F., ¶ 6).

### B.     Stryker's Acquisition and Distribution of Stale Inventory and Resulting Claims

Despite the warranty waiver and the lack of time to conduct an audit of the massive inventory before closing the deal in December 1998, Stryker sold the inventory it acquired

without delay. (Def. S.F., ¶ 7).  As it turned out, some of the inventory Stryker acquired was expired (or beyond its recommended shelf life) on the date of closing. (Def. S.F., ¶ 8).  Stryker distributed that stale inventory (knee implant products called the Duracon Unicompartmental Knee® ("DUK")), which failed in dozens of patients after implantation due to the defect and had to be removed and replaced. (Def. S.F., ¶¶ 9-10).  The patients in turn asserted claims for their injuries against Stryker alone or both Stryker and Pfizer (as the manufacturer of the DUK implants) ("Post-Closing Claims"). (Def. S.F., ¶¶ 11-12).

**C.**    **Stryker's Notice to TIG of the Post-Closing Claims and Settlements**

On August 17, 2000, Stryker began giving notice of the Post-Closing Claims to its 2000-2001 insurers.  The notice was provided via a letter directed to Winterthur (n/k/a XL Insurance America, Inc. ("XL")) (the underlying umbrella insurer) with TIG and Stryker's other excess insurers receiving copies.[1]  Over the course of the next two years, TIG was copied on boilerplate notices of the claims and/or suits (including copies of the complaints) as they were asserted against Stryker for some 75 Post-Closing Claims. (Def. S.F., ¶¶ 24-26).

TIG acknowledged the notices it received and asked to be kept "updated on any pertinent developments that may implicate our policy" regarding the Post-Closing Claims. (Def. S.F.,

---

[1] As part of its acquisition, Stryker expanded coverage under its existing liability insurance program to include the newly-acquired Pfizer Howmedica entity. (Def. S.F., ¶ 13). The 1999-2000 program was structured in layers, with Stryker assuming a self-insured retention ("SIR") for the first $2 million, National Union providing the next $15 million, TIG providing the next $25 million and other excess carriers providing an additional $165 million above TIG, for a total of $205 million of coverage above the SIR. (Def. S.F., ¶ 14).  The following year (2000-2001), XL replaced National Union's $15 million layer beneath TIG's. (Def. S.F., ¶ 15). In addition, Stryker added another $95 million of excess coverage bringing the total to $300 million above Stryker's SIR. (Def. S.F., ¶ 16). The XL policy contained a Definition of Occurrence – Medical Products Endorsement, under which claims arising from the same product defect pronounced in an Advisory Memorandum issued by Stryker during the 2000-2001 policy period were to be batched into that year. (Def. S.F., ¶ 17). The Advisory Memorandum regarding the DUK claims was issued on July 28, 2000. (Def. S.F., ¶ 18).

¶ 27).  TIG did not waive any policy term, including the consent requirement, in its communications with Stryker regarding the Post-Closing Claims. (Def. S.F., ¶ 27).

In September and October of 2001, TIG also was copied on two broker reports directed to XL and National Union that attached summaries of the settlements that Stryker had reached on the Post-Closing Claims.  However, at no time during the time the claims were being settled or reported did Stryker ask TIG to do anything or seek its consent of the settlements. (Def. S.F., ¶ 28).  And, based on the information TIG received in the reports (i.e., number of claims that were Stryker's responsibility and average settlement amount, Stryker's exposure for the Post-Closing Claims did not appear likely to come close to exceeding the $17 million in underlying limits. (Def. S.F., ¶ 29).  For example, the October 2001 report indicated that 70 Post-Closing Claims had been brought against Stryker as to which Stryker had been able to settle 15 for a total of $1,087,600 (approximately $72,500 per suit/claim).[2] (Def. S.F., ¶ 29).

### D.    The Pfizer Indemnification Claim and Stryker's Failure to Inform TIG of that Claim

During the same period of time that Post-Closing Claims were being asserted against Stryker, Pfizer also tendered the defense and made a claim for indemnification against Stryker pursuant to the Purchase Agreement for the Post-Closing Claims in which Pfizer had been implicated ("Pfizer Indemnification Claim"). (Def. S.F., ¶ 31).  The Pfizer Indemnification Claim (formally presented to Stryker in an April 16, 2001 letter) was not communicated to TIG. (Def. S.F., ¶ 31).  Nor did Stryker advise TIG that, despite its agreement to fully indemnify Pfizer for

---

[2] Eventually, Stryker would be implicated in 80 DUK-related claims/suits.  In *Stryker I*, this Court ruled that 75 of these claims were in the "batch" defined by the July 28, 2000 advisory memorandum for purposes of trigger the 2000-2001 policies. (*Stryker I*, Dkt. 689, pp. 17-18).  Between 2000 and 2006, Stryker settled its own liability in those 75 Post-Closing Claims for $7.6 million (approximately $100,000 per claim/suit). (Def. S.F., ¶ 29).  TIG did not receive any summaries related to the $6.5 million in settlements that were reached after October 2001. (Def. S.F., ¶ 30).

such claims in the Purchase Agreement, Stryker intended to categorically reject Pfizer's tender of the defense and claim for indemnification, which it did on June 29, 2001, or that Stryker's General Counsel viewed its position regarding the Pfizer Indemnification Claim as a "hard position to win on." (Def. S.F., ¶ 33).

In addition, despite the fact that about half of the Post-Closing Claims implicated both Stryker and Pfizer, Stryker reported those claims in Status Report summaries to its insurers as Stryker's sole responsibility. (Def. S.F., ¶ 34). The 75 claimants involved in the Post-Closing Claims are listed below. The 38 names in bold are those Post-Closing Claims involving both Stryker and Pfizer.

| | | |
|---|---|---|
| **Dorothea Alexander** | Kaija Hyvonen | **Peter Nelson** |
| **Nancy Barlett** | Freda Inlow | Carmen O'Leary |
| Allan Baker | Carol Johansen | Shirley Olsen |
| **Arnold Braswell** | Eileen Johnson | Dora Orr |
| Debbie Brickman | **Linda Kamen** | David Orrik |
| Sam Bridgers | **Nirmal Khanna** | **Saul Penn** |
| **Elaine Brincefield** | Donald King | Donald Priest |
| **Nancy Burkhard** | **Barbara Kingdon** | **Francis Reidy** |
| **Mary Burns** | **Diane Kitchens** | **Evelyn Rogers** |
| Leslie Carr | **Dorothy Kuethe** | **Norman Rosen** |
| **Norman Chaney** | **Christa Kulbe** | Richard Schulze |
| Barbara Cox | James Laird | Geraldine Scully |
| James Crouch | Suzanne Ledbetter | **Ira Seiler** |
| Chauncey Custer | David Lell | Delbert Sheffler |
| Delores Doeding | **George Lewett** | **Sharon Shultz** |
| James Eccles | **Ann Lueders** | **John Soho** |
| Wilma Ednie | **Ruth MacEwen** | Gerald Spreen |
| **Richard Fields** | Donald Major | Hugo Thornton |
| **Einifred Fisher** | Roy Martine | Joan Thorsness |
| **Leonard Forman** | **Theda Massie** | Virginia Tilford |
| **Marguerite Fry** | **Stella Matalas** | Joel Tuitt |
| **Paul Gaffney** | **Betsy McKelvain** | **Barbara Ward** |
| **Fred Galzerano** | Norman Melancon | **William Ways** |
| Oscar Garcia | **Michael Moffat** | Althea Wenzel |
| Lawrence Glahe | Pam Murray | Margaret Wilks |
| Rita Griggs | Delbert Napier | **Donne Zalusky-Nova** |
| Doris Horn | | **Patricia Zoeckler** |

Moreover, Stryker faced additional liability to Pfizer under the Purchase Agreement for interest on any Post-Closing Claim settlements or judgments incurred by Pfizer, as well as Pfizer's attorneys' fees in pursuing its indemnification claims against Stryker, together with interest on those fees. (Def. S.F., ¶ 32).   None of this information was communicated to TIG during the time Stryker was settling the Post-Closing Claims. (Def. S.F., ¶ 32).

Notwithstanding these realities, in the year following its rejection of Pfizer's Indemnification Claim, Stryker continued in its position that it was not required to indemnify and hold Pfizer harmless for the Post-Closing Claims – all without a word to TIG. (Def. S.F., ¶ 38). In October 2002, the first group of joint cases, involving 29 Post-Closing Claims, went to trial in Virginia (Orrik cases) (Def. S.F., ¶ 39).   Before the trial concluded, a global settlement of the cases was reached, with Stryker agreeing to pay $3,250,000 (34%) of the $9,525,000 total. Pfizer picked up the $6,275,000 balance needed to close the deal. (Def. S.F., ¶39).  The settlement was not reported to TIG.  (Def. S.F., ¶ 40).

### E.    The Pfizer Suit and Stryker's Failure to Provide TIG Key Documents Related to that Suit

On October 28, 2002, shortly after the Orrik settlement was reached, Pfizer filed suit against Stryker in federal court in New York ("Pfizer Litigation"). (Def. S.F., ¶ 41). On January 8, 2003, Stryker's broker forwarded a one-page Memo regarding the suit to Stryker's insurers. (Def. S.F., ¶ 42).  The cover letter from the broker was directed to National Union, with TIG and the other excess carriers (in the 1999-2003 policy years) noted as copy recipients. (Def. S.F., ¶ 42).  While the Memo generally described Pfizer's position that Stryker was obligated to reimburse it for Post-Closing Claims and provided the amount of damages sought, it did so

without reference to the fact that the position was based on the Purchase Agreement.  The Memo,

authored by Stryker's General Counsel's administrative assistant, stated in substantive part:

> On October 28, 2002, Pfizer Inc. and MTG Divestitures, Inc. (f/k/a Howmedica Inc.) (collectively, "Pfizer") filed suit against Stryker alleging, among other things, that Stryker is obligated to reimburse Pfizer for over $7.0 million in litigation expenses, including certain defense and settlement costs, "incurred as a result of third party claims arising from alleged injuries" due to the implantation of expired Duracon Uni-Knees sold after December 4, 1998.  In addition, Pfizer alleges that Stryker is obligated to reimburse or pay on behalf of Pfizer all judgments, awards, liabilities, losses, or settlements or other amounts which they become legally obligated to pay as a result of any third party claim for injury allegedly due to the use of a product" sold after December 4, 1998.  The suit has been filed in the U.S. District Court for the Southern District of New York.

(Def. S.F., ¶ 42).  Stryker failed to provide TIG with a copy of Pfizer's complaint against it, as

had been done with the Post-Closing Claims implicating Stryker. (Def. S.F., ¶ 43).

The Pfizer complaint revealed critical information not disclosed in the one-page Memo.

The facts alleged in the complaint included the following, which essentially recapped the

Stryker-Pfizer dispute to date:

- Both Stryker and Pfizer were implicated in numerous DUK suits, including some 29 cases in Virginia involving Post-Closing Claims ("the Orrik litigation").

- Under Section 2.5(c) of the Purchase Agreement, Stryker assumed "all liability for claims by third parties arising from the use or application of a product of Business sold after the Closing."

- Under Section 8.2 of the Purchase Agreement, Stryker agreed to indemnify and hold Pfizer harmless for "all such claims, losses, costs or damages" arising from such claims.

- Stryker had "declined Pfizer's tender of defense and claim for indemnification" for the post-Closing cases in a letter dated June 29, 2001, claiming that "the products in question should never have been conveyed to Stryker and, therefore, are not covered by Section 2.5(c) and Article VIII [Section 8.2] of the Agreement."

- On or about October 8, 2002, the plaintiffs in the <u>Orrik</u> litigation agreed to a settlement and that "[n]otwithstanding the fact that twenty-nine of the [] Duracon Uni-Knee lawsuits consolidated in the <u>Orrik</u> litigation were post-Closing cases, Stryker agreed to contribute only a small portion of the settlement amount," requiring the balance to be paid by Pfizer.

- Stryker has refused to defend, indemnify or hold Pfizer harmless with respect to other DUK lawsuits beyond those at issue in the <u>Orrik</u> litigation.

- As a direct result of Stryker's breach of the Purchase Agreement, Pfizer "ha[s] incurred and will incur in the future, significant expense, including attorneys' fees and costs, in connection with enforcing the right to indemnification under the Agreement, including attorneys' fees and costs incurred in bringing the instant action."

- Under the Purchase Agreement's terms, Stryker is obligated to indemnify Pfizer "by reimbursing [it] in full for all liabilities, losses, costs or damages incurred in post-Closing Uni-Knee lawsuits as well as all litigation expense incurred in connection with this matter."

(Def. S.F., ¶ 45). The complaint included two counts – one for declaratory judgment and another for breach of contract. The prayer for relief requested damages for breach of contract in the amount of $7,543,000, plus additional damages to be proven at trial and pre-judgment interest at the statutory rate. (Def. S.F., ¶ 46). Pfizer also sought relief in the form of a declaration holding Stryker liable for its defense and indemnification obligations with respect to future claims, including defense expenses and costs, together with all attorneys' fees, costs and expense incurred in connection with its efforts to enforce Stryker's indemnification obligations in the Pfizer Litigation. (Def. S.F., ¶ 46).

Within days of receiving the one-page Memo, TIG requested a copy of the Pfizer complaint, the Purchase Agreement, and Stryker's defense counsel reports. (Def. S.F., ¶ 44). There is no indication in the record that TIG received any of these materials outside of the

context of this coverage action.[3] (Def. S.F., ¶ 44).  Nor is there evidence in Stryker's or Marsh's

files that they were sent. (Def. S.F., ¶ 44).

After Pfizer filed its complaint, it obtained a default judgment against Stryker after

Stryker failed to timely respond. (Def. S.F., ¶ 47).  The New York court later set the $7.6 million

default judgment aside, after Stryker agreed to drop a suit against Pfizer it had filed in federal

court in New Jersey. (Def. S.F., ¶ 48).   On February 14, 2003, Stryker filed its Answer and

Counterclaim for Declaratory Judgment and Damages in the New York Pfizer suit. (Def. S.F.,

¶ 49).  On March 7, 2003, Pfizer filed its Reply to Stryker's Counterclaim. (Def. S.F., ¶ 49).

Pfizer amended its complaint on March 14, 2003 and Stryker amended its counterclaim on

March 17, 2003. (Def. S.F., ¶ 49).   On March 27, 2003, Stryker filed its Answer to Pfizer's

amended complaint. Pfizer filed its Reply to Stryker's amended counterclaim on April 3, 2003.

(Def. S.F., ¶ 49).   Stryker provided TIG none of these legal papers related to the Pfizer

Litigation until discovery in this case. (Def. S.F., ¶ 49).

In the months after Stryker's amended counterclaim was filed, Pfizer and Stryker

exchanged and conducted discovery. (Def. S.F., ¶ 50).  Pfizer also continued to resolve Post-

Closing Claims in which it was implicated. (Def. S.F., ¶ 51).  By September 12, 2003, Pfizer's

reported losses had grown to $11.0 million for Post-Closing Claims. (Def. S.F., ¶ 51).  Shortly

thereafter, Pfizer suffered adverse jury verdicts in two additional group cases involving Post-

---

[3] TIG received a copy of the Purchase Agreement in March 2005, after Stryker initiated its declaratory judgment
action in *Stryker II*. (Def. S.F., ¶¶ 44, 66). Stryker produced a copy of Pfizer's complaint (without exhibits) to TIG
in 2007. (Def. S.F., ¶ 44).  In connection with discovery in the current action, Stryker withheld defense counsel
communications related to the Pfizer Litigation on privilege grounds. (Def. S.F., ¶ 44).  TIG filed an Emergency
Motion to extend the discovery deadline in this case (Dkt. 461) to pursue further discovery (including production of
such defense counsel reports) related to TIG's recent development of facts during the discovery phase of this action
establishing that "Stryker breached a condition of the policy by failing to advise TIG of the extent of its DUK
liabilities."  The Magistrate denied the Motion. (Dkt. 476).  TIG's Objections to that ruling were filed on June 23,
2014 (Dkt. 484) and were denied by the Court on July 30, 2014 (Dkt. 496).

Closing Claims (Galzerano (4 cases) and Bartlett (3 cases)) totaling another $\underline{\text{6.9 million}}$ – an average of about $1 million per case. (Def. S.F., ¶ 51).  On November 4, 2003, the parties filed cross motions for summary judgment and briefs. (Def. S.F., ¶ 51).  The court also ordered that a mandatory settlement conference be held on December 16, 2003 before the federal Magistrate. (Def. S.F., ¶ 51).  All of these developments were reported to the underlying umbrella carriers in a report from Stryker's outside counsel dated December 2, 2003. (Def. S.F., ¶ 51).   The report concluded by noting:

> Although we understand that both of your clients have denied coverage – and have refused to defend and indemnify Stryker or HOC – for any of the Duracon Uni-Knee claims, including those at issue in the Pfizer litigation, we are providing this update out of an abundance of caution.  Stryker believes that the above-referenced policies sold to Stryker by your clients provide coverage for the amounts Pfizer may recover against Stryker in the Pfizer Litigation.
>
> In addition to the above amounts awarded or agreed to in resolving claims against Pfizer and its subsidiaries, Stryker agreed to pay plaintiffs in the four [sic] Gaalzerano cases $400,000 and plaintiffs in the three Bartlett cases $350,000 in settlement of claims against Stryker and its subsidiaries.

(Def. S.F., ¶ 51).

TIG was not copied on the report.  Nor did TIG receive any information related to the Pfizer Litigation activities outlined in it, including the summary judgment briefs. (Def. S.F., ¶ 52). Significantly, TIG was not advised that the underlying carriers had refused to defend and indemnify Stryker regarding the claims. (Def. S.F., ¶ 52).  Nor had it been informed that in the joint cases, where both Stryker and Pfizer were implicated as defendants, Stryker was not obtaining full releases when it settled those claims. (Def. S.F., ¶ 52).  Rather, Stryker was settling its liability only, leaving Pfizer to settle or try $\underline{\text{its own}}$ liability in those cases. (Def. S.F., ¶ 52).  Of course, Pfizer's liability for Post-Closing Claims was ultimately Stryker's problem given

Stryker's indemnification obligations and warranty waiver under the Purchase Agreement.  As Stryker's General Counsel (Curtis Hall) testified, "[Pfizer] had manufactured the products, but under the terms of the Agreement, unless [Stryker] could shift all of that burden back to Pfizer, we were getting stuck with those liabilities… ." (Def. S.F., ¶ 53).

### F.   December 2003 – The Actual Losses for Post-Closing Claims Exceed TIG's Attachment Point

At the time of the December 2, 2003 report, Stryker had spent $6,887,784 to resolve its own liabilities in the Post-Closing Claims. (Def. S.F., ¶ 54).  Thus, at the time of the report, Pfizer and Stryker had incurred a combined $18 million in settlements or judgments alone related to Post-Closing Claims. (Def. S.F., ¶ 54).  In addition, as Stryker's counsel noted in the report, Stryker knew it was also potentially liable for "fees and costs in the Pfizer Litigation" and prejudgment interest on all sums it would owe Pfizer. (Def. S.F., ¶ 54).

At this same point in time, the totality of information provided to TIG regarding Stryker's exposures for the Post-Closing Claims consisted of: (i) boilerplate notices of the Post-Closing Claims implicating Stryker (along with related claim or suit papers) and the two related settlement summaries (received in September and October 2001) and (ii) the one-page Memo (received in early 2003) regarding the Pfizer Litigation. (Def. S.F., ¶ 55).   None of these materials suggested the Post-Closing Claims would exceed the TIG Policy's attachment point. (Def. S.F., ¶ 55).

### G.   Stryker's Communications with TIG Following the Adverse Summary Judgment Result in the Pfizer Litigation and Its Filing *Stryker II*

Nearly <u>two</u> <u>years</u> transpired between the time TIG received the one-page Memo and the next communication from Stryker regarding the Pfizer Litigation, when Stryker advised TIG it

had lost its case against Pfizer.  Stryker's outside counsel first advised the underlying umbrella insurers on December 6, 2004 of the federal court's November 24, 2004 ruling, which granted Pfizer's motion for summary judgment and denied Stryker's. (Def. S.F., ¶ 56).  Counsel's letter noted that Pfizer had established as a matter of law that Stryker was "required to indemnify and defend Pfizer for losses which it suffered in connection with [the DUK] claims arising from implants sold after [the closing date], and to reimburse Pfizer for its attorneys fees in the Pfizer Litigation."  The letter further noted that counsel expected Pfizer's damages "could exceed $18 million." (Def. S.F., ¶ 57).  The December 6, 2004 letter from counsel was sent to TIG on December 15, 2004.  The cover letter to TIG advised, "both National Union and [XL] have already [sic] notified of this matter." (Def. S.F., ¶ 58).  It did not indicate that both insurers had denied coverage. (Def. S.F., ¶ 58).

On December 28, 2004, Stryker's outside counsel asked James Hopson of Marsh to "provide prompt notice to all of Stryker's excess carriers, from 1999 to date, of recent developments in this case that may trigger coverage under some or all of those policies," noting that this was an update to a letter dated January 8, 2003 (nearly two years prior) "to those carriers" regarding the Pfizer Litigation. (Def. S.F., ¶ 59).  On January 18, 2005, Mr. Hopson sent a letter to National Union with copies to the excess insurers, including TIG, enclosing Stryker's counsel's December 28, 2004 report. (Def. S.F., ¶ 60).  TIG received that communication on January 21, 2005. (Def. S.F., ¶ 60).  By the time TIG received the communication, Stryker had already filed suit against XL and National Union for coverage based on the Pfizer Indemnification Claim and TIG for any DUK-related loss in excess of that coverage ("*Stryker II*"). (Def. S.F., ¶¶ 60-61).

14

Stryker did not serve TIG with its complaint in *Stryker II* until May 2, 2005. (Def. S.F.,

¶ 62).   In the four months between filing and service, Stryker's outside counsel engaged TIG's

claims department in a series of communications, quickly pressing TIG for a coverage position

and to attend an upcoming mediation with Pfizer. (Def. S.F., ¶ 62). For example, in a February 3,

2005 letter to TIG regarding the Pfizer claim, Stryker's counsel advised:

> Last week you called me in response to my January 25, 2005 letter to Mr. Patrick
> Denning [of TIG] (a copy is enclosed).  You told me, on behalf of TIG, you had
> requested additional information about this case from Mr. James Hopson of
> Marsh… .[4]  In the future, please forward any requests for information directly to
> me.  You asked that I send a copy of the Winterthur policy for the year 2000.  A
> copy is enclosed.  You also told me that TIG would make no commitment
> concerning coverage, will not attend any mediation, and is reserving its rights.
>
> The mediation that was previously scheduled for February 7 will now take place
> later in the month.  Prior to the mediation, we would like to know TIG's position
> on coverage.  We would also like TIG to let us know whether it consents to
> Stryker's participation in the mediation for the purpose of attempting to settle the
> referenced action.  If we do not hear from you by the close of business (5 p.m.) on
> February 15, we will assume that TIG consents to Stryker's participation in the
> mediation for that purpose.

(Def. S.F., ¶ 63).

TIG received counsel's letter on February 9, 2005 and responded the next day. (Def. S.F.,

¶ 64). TIG's four-page letter directed to Stryker's counsel raised many questions regarding the

Pfizer Indemnification Claim and how it might impact the TIG Policy. (Def. S.F., ¶ 64).  In the

end, TIG indicated that it was "not in a position to state [its] coverage position since we need

additional information as to the claims and the positions of the carriers under TIG." (Def. S.F.,

¶ 64). Based on this lack of information, it further declined to provide Stryker with its consent to

---

[4] TIG requested this information from Mr. Hopson in an email dated January 25, 2005.  The information requested
included (i) a copy of the Pfizer Litigation complaint and (ii) a copy of the Purchase Agreement, which had been
requested by TIG in January 2003. (Def. S.F., ¶ 65).  The email indicated "[a]t this time TIG has insufficient
information to make any coverage determination and reserves its rights under the policy." (Def. S.F., ¶ 65).

participate in a mediation to resolve the Pfizer Litigation. (Def. S.F., ¶ 64).  TIG also requested

thirteen items it needed to assess coverage. (Def. S.F., ¶ 64).  This included requests for (i) a

copy of the complaint in the Pfizer Litigation and (ii) a copy of the Purchase Agreement, both of

which had been requested by TIG in January 2003 and again in TIG's email to Marsh dated

January 25, 2005. (Def. S.F., ¶ 65).   The letter concluded by stating, "Upon receipt of this

information we will further analyze our position.   In the interim, we continue to reserve our

rights under the policy." (Def. S.F., ¶ 64).

Stryker's outside counsel provided most of the requested information to TIG in late

March 2005.  (Def. S.F., ¶ 66).

On April 22, 2005, a judgment was awarded against Stryker and in favor of Pfizer for

$17.7 million, consisting of $12.8 million for indemnity (plus $2.2 million interest) and $2.3

million in attorneys' fees (plus $.4 million interest).  (Def. S.F., ¶ 67).

## III.   PROCEDURAL HISTORY OF THE CASE

On May 2, 2005, Stryker finally served the complaint in *Stryker II* on TIG. (Def. S.F.,

¶ 68). TIG then retained counsel, who filed a timely Answer and Affirmative Defenses on TIG's

behalf on May 23, 2005. (Dkt. 7).  Among the Affirmative Defenses raised were Ultimate Net

Loss and Breach of Conditions (including failure to inform and cooperate). (Dkt. 7, pp. 8-9).[5]

Shortly after the insurers' responses to the complaint were filed, the Court stayed *Stryker II*,

pending a resolution of a related coverage action Stryker previously had brought against its

underlying umbrella carriers in the same court ("*Stryker I*"). (Dkt. 36).

---

[5] Unless otherwise indicated, citations to the record noted as "(Dkt. ___)" refer to the current action ("*Stryker II*").

*Stryker I*, of course, refers to the initial declaratory judgment action Stryker filed on October 4, 2001.  That action was brought solely against Stryker's underlying umbrella insurers and involved only the sums Stryker had paid, and in the future would pay, to resolve its <u>own</u> liability for the Post-Closing Claims ("Direct DUK Claims").  (Def. S.F., ¶ 36).  We now know, however, that at the time Stryker filed *Stryker I*, Stryker had already made the decision to "go to war" with Pfizer over the Pfizer Indemnification Claim. (Def. S.F., ¶ 33).  Stryker also knew at the time that "140 to 150" potential Post-Closing Claims existed that in its estimation would take "$250,000 or more" each to resolve – an exposure of at least $35 million. (Def. S.F., ¶ 35).  It is puzzling, therefore, why Stryker made the choice not to include TIG (as the excess insurer above $17 million) or the Pfizer Indemnification Claim in *Stryker I*, especially since the Direct DUK Claims and Pfizer Indemnification Claim arose under the same "batch" for purposes of the 2000-2001 policies' Definition of Occurrence – Medical Products Endorsement.[6]

 On April 3, 2007, the Court issued its opinion following the trial in *Stryker I* finding XL liable for all defense costs and settlements of the Direct DUK Claims. (*Stryker I*, Dkt. 916).  That case then moved to a damages phase. (*Stryker I*, Dkt. 923).  Thereafter, the Court lifted the stay in *Stryker II* and, after several amendments of the complaint, Stryker moved for summary judgment against XL for a declaration that XL breached its duties to defend and indemnify Stryker regarding the Pfizer Indemnification Claim. (Dkt. 88).  Stryker also moved for summary judgment against TIG for a declaration that it was obligated to cover any loss in excess of the XL

---

[6] Stryker has stated that it did not name TIG as a defendant in *Stryker I* because "the full amount of the claims asserted directly against Stryker, <u>by itself</u>, [did] not exceed XL's policy limits." (Dkt. 262, p. 4) (emphasis added). However, these claims account for less than half of the total Post-Closing Claims actually filed against Stryker (i.e., 37 of 75) and only about a quarter of the total potential Post-Closing Claims (i.e., 37 of 140-150). (Def. S.F., ¶ 37).

17

Policy. (Dkt. 94).  The Court granted both motions in a January 8, 2009 amended opinion. (Dkt. 161 and 162).

In February 2009, XL reached a settlement with Pfizer pursuant to which it paid XL $26 million and fully resolved all of Stryker's liability to Pfizer. (Dkt. 221).  XL then filed a motion for summary judgment in both *Stryker I* and *Stryker II*, seeking a declaration that its payment to Pfizer exhausted the limits of the XL Policy. (*Stryker I*, Dkt. 1072; Dkt. 221).  On October 7, 2009, the Court denied XL's motion in *Stryker I* and in *Stryker II*, denied in part XL's motion with respect to exhaustion, holding that XL's breach of its duty to defend voided its Policy's limits of liability. (*Stryker I*, Dkt. 1093; Dkt. 196).  A final judgment to that effect was entered against XL the same day. (*Stryker I*, Dkt. 1094; Dkt. 196).

Both XL and TIG appealed this Court's various rulings in *Stryker I* and *Stryker II*.   The Sixth Circuit issued companion opinions on June 5, 2012.  The first opinion (related to XL's appeal) reversed this Court's rulings that held XL liable for losses in excess of its policy limits and remanded the case to determine if XL's Policy was exhausted.  *Stryker Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 806 (6th Cir. 2012).  The second opinion (related to TIG's appeal) reversed this Court's summary judgment against TIG finding that TIG is not bound by the *Stryker I* rulings because it was not a party nor in privity with a party to *Stryker I*. *Stryker II*, 681 F.3d 819, 824-825 (6th Cir. 2012).  The Sixth Circuit expressly found that TIG "is not precluded from raising its own coverage defenses on remand." *Id*. at 824.  Shortly after the case was remanded, and before an amended Case Management Order was entered or any discovery had occurred on the remanded coverage question, Stryker moved for summary judgment against TIG for a declaration that it owed coverage for the Direct DUK Claims. (Dkt.

261 and 262).  This Court denied Stryker's motion on June 27, 2013. (Dkt. 328).   In doing so, the Court recognized that TIG's position – that the Direct DUK Claim settlement did not fall within the TIG Policy's definition of Ultimate Net Loss due to Stryker's failure to obtain TIG's written consent for such settlements – was neither absurd nor unreasonable. (Dkt. 328, pp. 10-14).

Thereafter, the parties initiated discovery between themselves for the first time.   In October, the Court granted Stryker's motion to amend its complaint against TIG. (Dkt. 36).  The Supplemental Complaint, which converted the original declaratory judgment count against TIG to breach of contract and added a promissory estopped count, was filed on October 15, 2013.  TIG timely filed its Answer and Affirmative Defenses on November 5, 2013. (Dkt. 372).  Among the affirmative defenses asserted were defenses related to Ultimate Net Loss and Breach of Conditions. (Dkt. 372, p. 12).

## IV.   STATEMENT OF THE ISSUES PRESENTED

TIG contends that, as a matter of law, there is no coverage under the terms of its Policy for Stryker's Direct DUK Claim settlements for the two following independent reasons:

(i)     The Direct DUK Claim settlements (effected without TIG's consent) do not constitute Ultimate Net Loss under the TIG Policy, and there is no legal justification for not enforcing the consent requirement to the claims in this case; and

(ii)    Stryker breached Condition F. of the TIG Policy by failing to provide it with documents related to the Pfizer Indemnification Claim and Pfizer Litigation, resulting in a lost opportunity for TIG to associate in that claim and suit.

The material facts relevant to both issues are undisputed.  Thus, TIG is entitled to summary judgment on both issues.

19

## V.    ARGUMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### A.    TIG's Motion For Summary Judgment Should Be Granted Because the Subject Claim Settlements (Entered Into Without TIG's Consent) Do Not Constitute Ultimate Net Loss And There Is No Legal Justification For Not Enforcing The Consent Requirement In This Case

#### 1.    The Scope of Coverage for Claim Settlements under the TIG Policy

The TIG Policy's "Coverage" grant provides, in pertinent part, as follows:

>WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYLING INSURANCE, and (2) only after all UNDERLYLING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of occurrences insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE.

(Def. S.F., ¶¶ 19-20 (emphasis in original)).  With respect to settlements, the TIG Policy defines Ultimate Net Loss as "the amount of the principal sum…actually paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable…by…compromise with the written consent of [TIG]." (Dkt. 70-8, p. 14).  Absent TIG's written consent, any amounts paid to settle the Direct DUK Claims do not constitute Ultimate Net Loss under the TIG Policy.

Even in the context of insurance policy conditions that require prior written consent from the insurer, courts have consistently recognized there is no coverage for settlements made by the insured absent the Insurer's consent. *See Dupuis v. Utica Mut. Ins. Co.*, 2006 WIL 1084336 at *7 (Mich. App. 2006) (unpublished) (insurer not liable for insured's voluntary settlement payment when insured failed to obtain insurer's written consent); *Lee v. Auto-Owners Ins. Co.*, 218 Mich. App. 672, 674, 554 N.W.2d 610 (Mich. App. 2009) (no coverage available to insured when insured settled without obtaining written consent from insurer; *see also, Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 470, 761 N.W.2d 846 (Mich. App. 2008) (*citing Giffels v. Home Ins. Co.*, 19 Mich. App. 146, 172 N.W. 540 (Mich. App. 1960) (express terms of policy requiring insurer's consent for payment of settlement released insurer from liability)). Moreover, it is conceded that TIG never provided written consent for Stryker's Direct DUK Claim settlements.

In this Court's June 27, 2013 ruling denying Stryker's motion for summary judgment on liability against TIG, the Court addressed Stryker's argument that the consent requirement

should not apply in this case because the settlements (when entered into) were still "within" the

underlying limits.  The Court stated:

> [Stryker] contend[s] that construing the policy to require the insured to obtain the consent of an excess insurer before settling within primary limits is unreasonable and would produce absurd results. [citation omitted] …The Court does not agree that TIG's construction of the policy would produce absurd results.  [Stryker's] position is based on the assumption that Stryker's settlements within XL's limits did not implicate the excess policy.  That assumption is not correct.  *The TIG policy clearly provides only for payment of Ultimate Net Loss, which is defined to include only settlements which have been entered into with TIG's written consent.*  The TIG policy does not *exclude* the consent requirement for settlements within the underlying policy limits.  It is neither unreasonable nor absurd for an excess insurance policy to require the insured to obtain consent to settlements that the insured might in the future want to include in the calculation of the Ultimate Net Loss.

Dkt. 327, pp. 12-13 (emphasis added).  TIG submits that there is no reason for the Court to

disturb its prior determinations that the Ultimate Loss Provision is clear in its requirement that

settlements be consented to by TIG and that there are no exceptions to that requirement.  In other

words, the TIG Policy should be enforced as written. *See Tooling Mfg. & Tech. Ass'n. v.

Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012) ("[t]he Michigan Supreme Court has

identified the following insurance-contract principles: [] an insurance contract must be enforced

in accordance with its terms [and] [a] [c]ourt must not hold an insurance company liable for a

risk that it did not assume").

Even more, as the discovery in this case has demonstrated, we now know that Stryker's

previous argument against applying the consent requirement in this case (i.e., that because

<u>Stryker</u> did not reasonably believe its DUK-related exposures would implicate the TIG Policy

when it was settling the claims) is wrong.[7]  Before Stryker had begun settling the Direct DUK Claims, <u>Stryker</u> knew that there were "140 to 150" potential Post-Closing Claims, which it valued at "$250,000 or more." (Def. S.F., ¶ 35).   That is an exposure of at least $35 million.  As this Court (somewhat prophetically) said in its June 27, 2013 opinion, "…The insured is in the best position to know its potential exposure, and if it wants to preserve its potential right to excess insurance, it is not unreasonable or absurd to require it to consult with the excess insurer." (Dkt. 327, p. 12).  Stryker simply failed to do so in this case.

The Court's June 27, 2013 opinion also addressed Stryker's argument that TIG's counsel had admitted in response to the Court's question at oral argument that Stryker did not need TIG's consent to settle the claims against Stryker. (Dkt. 327, p. 13).  This was based on counsel's representation that, while TIG had an interest in early settlements (within the underlying layer), TIG did "not have a right to deny consent to a settlement that Stryker proposes to make within the limits of the XL policy." *Id.*   Stryker has asked virtually every TIG witness this same question during deposition – and received the same answer. (Def. S.F., ¶ 21).  We anticipate Stryker will attempt to characterize that testimony (like it did with TIG's counsel's representation) as an admission that Stryker did not need TIG's consent in this case.  However, the Court's prior ruling on this argument should stand.  That ruling made clear that any representation that "TIG would not have withheld consent for a settlement within XL's policy limits, is **not** an admission that Stryker did not need TIG's consent to settle the claims if it

---

[7] In the context of TIG's briefing on summary judgment on remand, TIG stated:  "It is apparent that Stryker did not seek consent from TIG for its settlements because it believed XL (and initially National Union) to be responsible for those settlements. …This was certainly a reasonable view and one later confirmed by rulings in *Stryker I*." (Dkt. 300, p. 14).  This statement was made before discovery occurred between Stryker and TIG.

wanted them included in the calculation of Ultimate Net Loss." *Id*. (emphasis added).  Indeed, this is a point countless TIG witnesses made during their depositions.[8] (Def. S.F., ¶ 21).

### 2.   Proof of Prejudice is Not Required under Michigan Law to Enforce the Policy's "Consent to Settle" Requirement

While the Court's June 27, 2013 opinion stated that "TIG's representation that [TIG] would not have denied consent <u>may</u> factor into a consideration of whether the lack of notice caused TIG prejudice," the Court expressly acknowledged that the "question of prejudice [was] not currently before the Court." (Dkt. 327, pp. 13-14) (emphasis added).  However, under Michigan law, a showing of prejudice is not required in order for TIG to enforce the "consent to settle" provision of the TIG Policy's insuring agreement. *See, e.g., Detroit Water Team Joint Venture v. Agricultural Insurance Company*, 371 F.3d 336, 341 (6th Cir. 2004) (holding under Michigan law insurer is not required to prove prejudice for a loss not falling within the policy's insuring agreement); *see also, Tenneco, Inc. v. Amerisure Mut. Ins. Co*., 281 Mich.App. 429, 467 (2008) (in context of "no action" clause that was "a condition precedent to the insurer's liability" held no prejudice required under Michigan law). Therefore, whether TIG was harmed by Stryker's failure to provide it with the opportunity to consent to the Direct DUK Claim settlements is not germane to the present coverage analysis.

---

[8] For example, Marilyn Schultz, the TIG underwriter who drafted the TIG excess liability form at issue, testified that if the settlement "is never presented to TIG for payment, [it] doesn't care," but "if a claim were being presented to TIG to pay, then TIG has to agree to [the] settlements." (Def. S.F., ¶ 21) (Schultz Dep. at 149:20, 128:15-17). Another TIG underwriter at the time, Don Bendure, was asked if "TIG had the right to consent to all settlements within the underlying layer." He testified, "Yes, if they intend to call upon TIG to participate," which he clarified as meaning "to pay." (Def. S.F., ¶ 21) (Bendure Dep. at 148:9-18).

### 3. There Are No Legal Justifications for Not Enforcing the Consent Requirement

#### a. No waiver has occurred.

In its June 27, 2013 ruling, the Court also addressed Stryker's various arguments that TIG had waived the right to assert the "consent to settle" requirement as a defense in this action. (Dkt. 327, pp. 15-19). The Court rejected all but one of Stryker's arguments. That argument was defined as "whether TIG waived its right to enforce the "consent to settle" provision at the time Stryker entered into the settlements of the direct DUK claims." *Id*. at 17. As to that argument, the Court indicated that because "the record [was] silent as to what communications Stryker did or did not have with TIG prior to entering into the settlements," fact issues needed to be "fleshed out." *Id*.

After a year of discovery, we now know the answer. TIG said nothing in its communications with Stryker prior to the settlements that would establish a waiver (i.e., intentional relinquishment of a known right) of the consent requirement. In fact, Stryker's Supplemental Complaint does not allege waiver, but instead asserts a count for promissory estoppel. (Dkt. 363, pp. 10-12). Stryker's Count II ("Promissory Estoppel Against TIG") alleges, "On three occasions, TIG represented [to Stryker] that coverage under its policy turned solely on whether the XL policy provided coverage." (Dkt. 363, p. 10, ¶71). The three occasions alleged involved representations in 2008 by TIG's counsel in two court filings and at oral argument in connection with opposing Stryker's motion for summary judgment regarding coverage for the Pfizer claim. (Dkt. 363, pp. 10-11, ¶¶71A-C). These representations by

counsel are no different in substance[9] than those Stryker used to support its argument at summary judgment a year ago that TIG waived (by judicial admission) the "consent to settle" defense through its counsel's representations to the Court in 2008.

The Court rejected Stryker's "waiver by judicial admission" argument, noting in its June 27, 2013 opinion, "[i]n order to qualify as a judicial admission, an attorney's statements must be deliberate, clear and unambiguous." *Citing MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997); and *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (for the further point that "legal conclusions are rarely considered to be binding judicial admissions"). (Dkt. 327, p. 19).  The Court found that the statements referenced were not unambiguous, because they "were made before XL exhausted the underlying policy by settling the Pfizer action in February 2009" and "[a]t the time the statements were made, both Stryker and TIG anticipated that XL would cover Stryker's settlements of the direct DUK claims." (Dkt. 327, p. 19).  This Court, thus, concluded that TIG did not waive its 'consent to settle' defense through its lawyer's representations to the Court [made when TIG was being asked to provide coverage for the Pfizer claim, not the direct DUK claims]." (*Id.*, 18-19).

### b.    No promissory estoppel can be proven.

Stryker's Count II ("Promissory Estoppel Against TIG") argument is an attempt to repackage its failed "waiver by judicial admission" argument under a different legal theory. However, the result is the same.  To prevail on a theory of promissory estoppel, plaintiffs must show: (1) a promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; (3) which in fact produced reliance

---

[9] In fact, one of the representations – related to a statement TIG made in a March 24, 2008 brief – is the same. (*compare* Dkt. 262, p. 7 and Dkt. 363, p. 10, ¶71A).

or forbearance of that nature; and (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *Marrero v McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 442; 505 N.W.2d 275 (1993). "The doctrine of promissory estoppel is cautiously applied. In order to support a claim of estoppel, a promise must be definite and clear." *Barber v SMH (US), Inc.*, 202 Mich. App. 366, 376; 509 N.W.2d 791 (1993) (internal citation omitted). Stryker alleges that the representations by TIG's lawyers in 2008 (i.e., "that coverage under its policy turned solely on whether coverage existed under the XL policy and that its arguments against coverage 'piggybacked' those of XL" (Dkt. 363, pp. 10-11, ¶¶ 71-72)) were both clear and definite. Just as before, such representations were made when Stryker and TIG both believed that XL would be covering the Direct DUK Claim settlements, not TIG. The representations are, thus, not clear and do not constitute a promise. For this reason alone, Stryker's promissory estoppel argument fails.[10]

### c.   No "implied consent" by estoppel can be proven.

Perhaps facing these hard truths, Stryker has belatedly asserted yet another theory under which it can prove coverage – implied consent by silence. Its latest theory was disclosed in one of Stryker's expert reports submitted to TIG on April 1, 2014. The theory was articulated as follows: "By its silence [during the period Stryker was settling the Direct DUK Claims], TIG impliedly consented to Stryker's settlements and gave Stryker reasonable grounds to believe that Stryker's settlements were not jeopardizing [TIG's] coverage." (Dkt. 462, pp. 5-6) (*Expert Report of William T. Cormack*, p. 16).

---

[10] TIG does not concede that Stryker can satisfy the other elements of promissory estoppel, which it has the burden of proving since the theory is being used to establish coverage for claims otherwise not falling within the policy terms.

TIG contends that Stryker was required to move for leave to add this new legal theory to its Supplemental Complaint since it has the burden of proving coverage. *See Tooling Mfg. & Tech. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 671 (6th Cir. 2012) (insured has burden to demonstrate that its claim falls within the terms of the policy in the first instance).  Having failed to do so, it should not be permitted to raise it at summary judgment or trial. *See* Fed.R.Civ.P. 8.8(a)(2) (rule requires "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) ("[o]nce a case has progressed to the summary judgment stage…the liberal pleading standards under [the Federal Rules] are inapplicable").

However, even if timely raised, this theory fails as a matter of law.  Indeed, as an excess insurer with no duty to defend,[11] TIG's consent cannot be established impliedly (an estoppel by silence)[12] because it had no duty to speak (i.e., raise coverage defenses) at any time during the period in which Stryker was settling the underlying claims.  This is true even if TIG believed the claims would impact its layer, which it did not.   Under Michigan law, an inducement by silence cannot be established unless there is a duty to speak. *Tenneco*, 281 Mich. App. at 446 ("[s]ilence

---

[11]  The TIG Policy provides: "WE shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or suit brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any occurrence which, in OUR opinion, may create liability on the part of US under the terms of the policy." (Def. S.F., ¶ 22).

[12]  TIG does not concede that Stryker can prove the other two elements of estoppel.  For equitable estoppel to apply, the party seeking its application must establish not only that (i) a party, by representations, admissions, or silence intentionally or negligently induced another party to believe facts, but also that (ii) the other party justifiably relied and acted on that belief and (iii) the other party is prejudiced if the first party is allowed to deny the existence of those facts. *West Am. Ins. Co. v. Meridian Mut. Ins. Co.*, 230 Mich. App. 305, 310, 583 N.W.2d 548 (1998).  TIG requested more time in discovery to pursue evidence (including documents withheld on privilege grounds) related to Stryker's contention that it actually relied on TIG's silence during the period it was settling the Direct DUK Claims. (Dkt.461).  TIG's motion was denied by the Magistrate Judge. (Dkt. 476).  On July 30, 2014, the Court overruled TIG's Objection to the Magistrate Judge's denial. (Dkt. 496).

or inaction alone is insufficient to invoke estoppel absent a legal or equitable duty to disclose."). Moreover, an insurer's mere silence is not a waiver of the right to approve a settlement. *Moore v. First Security Casualty Co*, 224 Mich. App. 370, 568 N.W.2d 841 (1997).  As the Michigan appellate court explained in *Moore*:

> Under [the policy's] plain terms, the policy provides that [a] claim will not be covered if the resulting lawsuit is settled without defendant's consent. Waiver is defined as the intentional and voluntary relinquishment of a known right. Black's Law Dictionary (6th ed.).  <u>It necessarily follows that conduct that does not express any intent to relinquish a known right is not a waiver, and a waiver cannot be inferred by mere silence.</u> See 6 Couch, Insurance (3d ed.), § 85:25, p. 85-39 (stating that, as a general rule, a waiver cannot be inferred from the mere silence of the insurer). In the present case, it is undisputed that defendant did not explicitly consent to the settlement of plaintiffs' claims or waive its right to approve any settlement of plaintiffs' case.

*Moore v. First Security Casualty Co*, 224 Mich. App. 370, 376 (emphasis added).[13]

Here, TIG's silence cannot establish a waiver, as a matter of law.  Moreover, because TIG had no duty to speak, TIG's alleged failure to raise coverage defenses when Stryker was settling the Direct DUK Claims cannot be an inducement that supports an estoppel.  Only if an insurer has a duty to defend the insured, will the insurer be estopped from denying coverage in a later proceeding if the insurer has conducted the defense of the insured's claim without reserving rights or otherwise disclaiming coverage. *Kirschner v. Process Design Assoc*., 459 Mich. 587, 592 N.W.2d 707 (1999).  As a corollary, an excess carrier <u>without</u> a duty to defend is not required to reserve rights or disclaim coverage and cannot be estopped from raising coverage defenses based on failing to do so:

---

[13] Nor is "an insurer's mere silence [] a basis for implying consent to a settlement." *Cincinnati Ins. Co. v. Bott*, 2005 WL 3018030 (Mich.App. Nov. 10, 2005) (unpublished).

It is common at the outset of a case for coverage issues to be unresolved, or for coverage questions to be unanswered. To avoid arguments that it has waived no coverage defenses or should be estopped from asserting them, a primary insurer that undertakes its insured's defense in a case of questionable coverage typically does so under a reservation of rights.

Because an excess insurer has no duty to defend its insured, it cannot later be estopped from raising coverage defenses, or be said to have waived those defenses, if it fails to reserve its rights when notified of a claim or suit potentially implicating its coverage.[14]   It is, after all, an insurer's duty to defend which compels it to reserve its rights, and without a duty to defend an excess insurer has no obligation to issue a reservation of rights letter.[15]

4-24 *Appleman on Insurance* § 24.04 [3][a] (emphasis added).  This widely-adopted rule and its

rationale were articulated by the Illinois appellate court in *Montgomery Ward and Co., Inc. v.*

*Home Ins. Co.*, 753 N.E.2d 999 (Ill. App. 1st Dist. 2001):

The estoppel doctrine applies only where an insurer has breached its duty to defend.  Thus, a court inquires whether the insurer had a duty to defend and whether it breached that duty.  It is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter.  An excess insurer that has no duty to investigate coverage issues or to defend its insured will not be estopped from later asserting coverage defenses by a failure to issue a reservation of rights letter….   It is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter.

*Montgomery Ward and Co., Inc.*, 753 N.E.2d at 1006-1007 (emphasis added).

---

[14] *Citing Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 899 F. Supp. 498, 501 (D. Or. 1995), *aff'd sub nom*; *see also Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London*, 139 F.3d 1234 (9th Cir. 1998); *Philadelphia Indem. Ins. Co. v. Barerra*, 998 P.2d 1064, 1069 (Ariz. Ct. App. 1999); *State Farm Fire & Cas. Co. v. Jioras*, 29 Cal. Rptr. 2d 840, 844 (Cal. Ct. App. 1994); *Montgomery Ward & Co. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. App. Ct. 2001); *Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 855 (Ill. App. Ct. 1993).

[15] *Citing Sargent & Lundy*, 609 N.E.2d at 855.

The TIG Policy contains no duty to defend.  Thus, TIG had no obligation to speak at any time before it was required to respond to Stryker's Complaint in May of 2005.  Absent such a duty, as a matter of law there can be no inducement and no estoppel.

Finally, "[t]he application of waiver and estoppel is limited, and usually, the doctrines will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Kirschner*, 592 N.W.2d at 709-10 (citing *Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (Mich. 1920); *Lee v. Evergreen Regency Coop.*, 390 N.W.2d 183 (Mich. App. 1986)).[16]  As Michigan's Supreme Court explained long ago:

> The cases where the doctrine of waiver, or estoppel, has been applied have largely been cases where the insurance companies have relied on a forfeiture of the contract, upon breaches of the warranties and conditions to work such forfeitures; and in many such cases this court and other courts of last resort have held that <u>if the companies have led the other party, to his prejudice, to his expense, to understand that such forfeitures, such breached of [sic] warranties and conditions, would not be insisted upon, then the companies would be estopped from asserting such defenses</u>.  But here defendant makes no claim of forfeiture of the contract; on the contrary, it is insisting on the contract itself, and insisting that by its terms it did not insure the deceased when engaged in military services in time of war.  <u>To apply the doctrine of estoppel and waiver here would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract and never assumed by the defendant under the terms of the policy</u>. In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract they did make.
>
> *        *        *
>
> We do not understand that the doctrine of waiver or estoppel goes that far. After a loss accrues, an insurance company may, by its conduct, waive a forfeiture; or by

---

[16] The *Kirschner* court noted that coverage might be expanded if "the insurance company has misrepresented the terms of the policy to the insured or defended the insured without reserving the right to deny coverage." *Kirschner*, 459 Mich. at 594-595.  There is no allegation (much less proof) that TIG misrepresented the terms of its policy here. Nor did TIG defend Stryker without reserving rights, as its policy contains no duty to defend.

some act before such loss it may induce the insured to do or not to do some act contrary to the stipulations of the policy, and thereby be estopped from setting up such violation as a forfeiture; but <u>such conduct</u>, though in conflict with the terms of the contract of insurance and with the knowledge of the insured and relied upon by him, <u>will not have the effect to broaden out [sic] such contract so as to cover additional objects of insurance or causes of loss.</u>

*Ruddock*, 177 N.W. at 248 (internal citations omitted) (paragraph breaks added) (emphasis added).  *See, e.g.*, applying *Ruddock* to reject insured's waiver/estoppel argument:  *City of Three Rivers*, 290 N.W. 390, 391-92 (Mich. 1940); *Henne v. Glens Falls Ins. Co. of Glens Falls, NY*, 222 N.W. 731 (Mich. 1929); *Wells v. Prudential Ins. Co. of America*, 214 N.W. 308, 309 (Mich. 1927) (citing *Ruddock* and *Ames v. Auto Owners Ins. Co.*, 195 N.W. 686 (Mich. 1923)).

Stryker's new theory is not properly pled and, in any event, fails under Michigan law. TIG had no duty to speak, and thus, its silence could not constitute an inducement to Stryker that TIG was "impliedly consenting" to the claim settlements.  Even if such an estoppel were proven, it could not act to broaden the coverage to include settlements effected <u>without</u> TIG's consent.

   **B.**    **TIG's Motion For Summary Judgment Should Be Granted Because Stryker Breached Condition F. Of The TIG Policy By Failing To Provide It With Documents Related To The Pfizer Indemnification Claim And Pfizer Litigation, Resulting In A Lost Opportunity For TIG To Associate In That Claim And Suit**

   **1.**    **Stryker's Duties in the Event of a "Claim or Suit"**

While TIG had no duty to act during the time Stryker was settling the Direct DUK Claims, Stryker did have such duties under the TIG Policy.  The TIG Policy contains certain conditions with which Stryker must comply or forfeit coverage.[17]  One of the conditions sets

---

[17]  The TIG Policy states:  "WE have no duty to provide coverage under this policy unless YOU and any other involved insured have fully complied with the conditions of this policy." (Def. S.F., ¶ 23).

forth Stryker's duties in the event a "claim or suit" is brought against it – Condition F.  Condition F. provides, in pertinent part:

*  *  *

2.  If a claim is made or suit brought against YOU, YOU must see to it that WE receive prompt written notice of the claim or suit.

3.  YOU and any other involved insured must:

  a.  Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

*  *  *

(Def. S.F., ¶ 23).

## 2.  Stryker's Breach of Condition F. Duties

Stryker repeatedly breached Condition F. with respect to its handling of the Pfizer Indemnification Claim and resulting suit.  First, the Pfizer Indemnification Claim was made against Stryker by letter dated April 16, 2001.  Stryker failed to provide TIG written notice of that claim – a breach of Condition F.2. (Def. S.F., ¶ 31).  Second, Stryker failed to provide TIG a copy of that demand letter – a breach of Condition F.3. (Def. S.F., ¶ 23).   Third, Pfizer sued Stryker on October 28, 2002.  While Stryker provided TIG with notice of that suit in the one-page Memo, it did so on January 9, 2003 (more than two months after its filing) – hardly the "prompt" notification required under Condition F.2.  Fourth, Stryker failed to send TIG copies of any of the "legal papers received in connection with the suit" (a recurring violation of Condition F.3.a.).  These legal papers included the following, which were received by Stryker during the first year or so of the Pfizer Litigation:

- Pfizer's Complaint
- Default Judgment

33

- Pfizer's Memorandum of Law in opposition to Stryker's motion to vacate the default judgment
- Court Order granting, in part, motion to vacate
- Pfizer's Reply to Stryker's Counterclaim
- Pfizer's Amended Complaint
- Pfizer's Reply to Stryker's Amended Counterclaim
- Court Order assigning case to Magistrate Judge for settlement
- Pfizer's Memorandum of Law in support of its motion for summary judgment
- Pfizer's Opposition to Stryker's motion for summary judgment

Stryker's non-compliance with Condition F. had important repercussions for TIG.  As noted above (pages 9-10), Pfizer's Complaint alone would have revealed significant information regarding the parties' dispute over indemnification for the Post-Closing Claims, including the fact that Stryker had legally obligated itself to such an undertaking.  Pfizer's summary judgment filings likewise would have provided TIG with the information required for it to assess for itself the relative merits of Pfizer's claim, including Pfizer's assertion that by waiving the UCC warranties for merchantability and fitness Stryker caused its own losses by selling the stale inventory without first inspecting it. (Def. S.F., ¶¶ 51-55).   Other documents would have informed TIG of Pfizer's increased damages demand and the timing of possible settlement opportunities with Pfizer.

Given the scope and nature of Stryker's violations, there can be no genuine dispute that Stryker failed to fulfill its Condition F. obligations.

### 3.      TIG Was Prejudiced by Stryker's Breach of Condition F.

Stryker's failure to provide TIG with the documents specified in Condition F. of the TIG Policy was unquestionably prejudicial to TIG.  The TIG Policy provides that Stryker "must cooperate with [TIG] in the investigation, settlement or defense" of any claim or suit. (Def. S.F.,

¶ 22). Moreover, the TIG Policy states that TIG "shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any occurrence which, in OUR opinion, may create liability on the part of [TIG] under the terms of this policy." (Def. S.F., ¶ 22). Stryker's repeated failure to provide TIG the information and documents specified in Condition F. of the policy, resulted in the ongoing loss of opportunity for TIG to analyze Stryker's exposures for itself and, in turn, determine whether it wanted to invoke its rights (set forth in the above TIG Policy provisions) to get more involved in the defense of the claim and/or suit.

TIG's lost opportunity is prejudicial as a matter of law. Indeed, the Michigan courts have stated that "[a]n insured suffers prejudice when the insured's delay in providing notice materially impairs the insurer's ability to contest its liability to the insured or the liability of the insured to a third party." *Tenneco*, 281 Mich. App. at 448, 761 N.W.2d 846, *citing West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036-1037 (6th Cir. 1990). As the *Tenneco* court stated:

> In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability to: (1) investigate liability and damages issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (5) to contest its liability to its insured.

*Tenneco,* 281 Mich. App. at 448, *citing Aetna Case & Surety Co. v. Dow Chem. Co.*, 10 F.Supp.2d 800, 813 (E.D. Mich. 1998). In addition, the question of prejudice is a question of law for the court if only one conclusion can reasonably be drawn from the undisputed facts. *Wehner v. Foster*, 331 Mich. 113, 120-122, 49 N.W.2d 87 (1951). Further, "Michigan law does

not require an insurer to prove that but for the delay it would have avoided liability." *West Bay Exploration*, 915 F.2d 1030, at 1037 (emphasis in original).

In the present case, Stryker unilaterally decided to reject Pfizer's claim and resolve it through litigation, without giving TIG notice of this decision (through documents required by the policy), depriving TIG of the opportunity to associate in the claim and suit resulting from that decision.  Stryker's decision not only was a foolish strategy (given the breadth of its contractual indemnification undertaking and waiver of any UCC-warranty from Pfizer for the expired DUK implants it acquired), the decision also acted to unnecessarily drive up the costs by millions of dollars, which it ultimately passed along to its insurers for payment.  Stryker could have simply accepted its contractual responsibility to Pfizer by defending and resolving Pfizer's liability for the Post-Closing Claims, reserving its right to sue them later.[18]  After all, Stryker was implicated in each of the 38 Post-Closing Claims also involving Pfizer.  So, Stryker merely needed to obtain a complete release from those claimants (albeit likely with a larger payout), rather than just a release of its own liability.  Instead, Stryker decided to force Pfizer to defend and resolve those Claims while simultaneously litigating its contractual obligations with Pfizer, knowing that if it pursued that litigation and lost, it (Stryker) would be liable not only for Pfizer's defense expenses ($1.1 million) and settlement / judgment costs ($12.8 million) in connection with the Post-

---

[18] In addition, Stryker could have informed TIG that XL had denied coverage and was refusing to defend Stryker in respect of the Pfizer Indemnification Claim.  Had it done so, TIG could have taken action with respect to XL.  For example, it could have demanded that XL defend and resolve all of the Post-Closing Claims (including those also involving Pfizer), under a full reservation of rights on coverage.  At minimum, this would have cutoff the additional losses (i.e., attorneys' fees and interest) eventually suffered by Stryker in the Pfizer Litigation, if not also resulted in a reduction in the sums needed to resolve the Claims. C*ommercial Union Ins. Co. v. Med. Protection Co.*, 426 Mich. 109, 119, 393 N.W. 499 (1986) (holding that excess insurer has a right of equitable subrogation against the primary insurer for bad faith failure to defend or settle within policy limits).

Closing Claims, but also Pfizer's attorneys' fees ($3.1 million) it incurred in enforcing the Purchase Agreement.

Stryker's litigation strategy proved to be a multi-million dollar gamble.  In the end, however, Stryker was not really gambling with its own money, given its decision to submit the $3.1 million in additional costs to its insurers.  In 2012, XL used that sum, together with the $12.8 million in settlement/judgment expenses, to exhaust its $15 million limits, thus leaving TIG potentially liable for the entire $7.6 million loss related to Stryker's Direct DUK Claim settlements.[19]

Stryker's failure to provide TIG with the documents specified in Condition F. of the TIG Policy constitutes a breach of that condition to coverage and such failure was undeniably prejudicial to TIG.  Accordingly, Stryker's coverage claim should be rejected.

**VI.**     **CONCLUSION**

For the foregoing reasons, TIG's Motion for Summary Judgment should be GRANTED and judgment should be entered in favor of TIG and against Stryker declaring that there is no coverage under the TIG Policy for the underlying claim settlements.

Respectfully submitted,

Dated:  July 31, 2014                         By:     /s/ Mary E. Fechtig

Mary E. Fechtig
Beth A. Stroup
CARROLL MCNULTY & KULL, LLC
100 North Riverside Plaza, Ste. 2100
Chicago, IL 60606
(312) 800-5000
mfechtig@cmk.com
bstroup@cmk.com

---

[19] XL also claimed a right to collect the $.9 million "overpayment" in connection with the Pfizer settlement from TIG. (Dkt. 284).  The Court denied that request without prejudice. (Dkt. 305, p.2).

-and-

Carole D. Bos
BOS & GLAZIER, P.L.C.
990 Monroe Avenue N.W.
Grand Rapids, MI 49503
(616) 458-6814
cbos@bosglazier.com

*Attorneys for Defendant – TIG Insurance Company*