UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

           Plaintiffs,           Case No. 1:05-cv-51

v.                            HON. ROBERT HOLMES BELL

XL INSURANCE AMERICA,
INC. and TIG INSURANCE
COMPANY,

           Defendants.

---

# STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT TIG INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

1

Defendant, TIG Insurance Company ("TIG"), submits this Statement of Undisputed Facts in Support of TIG's Motion for Summary Judgment.  TIG contends the material facts listed below are undisputed, there is no genuine issue to be tried, and TIG is entitled to judgment as a matter of law.

**The Parties**

1.     This case is an insurance coverage dispute involving the excess liability policy, policy number XLX9274031, issued by TIG for the period January 1, 2000 to January 1, 2001 with limits of $25 million excess of $17 million (the "TIG Policy").  (TIG Policy attached as EXHIBIT 1.)

2.     Plaintiffs Stryker Corporation and Howmedica Osteonics, Corp. ("Stryker") are Insureds under the TIG Policy.  (TIG Policy, EXHIBIT 1.)

**The Pfizer Howmedica Acquisition**

3.     In the summer of 1998 Stryker decided to acquire Pfizer, Inc.'s Howmedica division, which propelled Stryker to "become[] one of the largest players in the orthopedic implant business" and "a leader in the worldwide medical technology implant marketplace." (Printout       from       Stryker's       website       at       https://www.stryker.com/en-us/corporate/AboutUs/History/index.htm attached as EXHIBIT 2.)

4.     Today, Stryker considers the decision to be "the single biggest business decision in the Company's history." (Printout from Stryker's website, EXHIBIT 2.)

5.     Stryker acquired Pfizer's Howmedica division for nearly $2 billion, a transaction that came together in a matter of weeks as part of a bidding process against several competitors, with Pfizer dictating the terms in a pre-packaged acquisition agreement. (Stock and Asset

Purchase Agreement between Pfizer and Stryker dated August 13, 1998 (the "Purchase Agreement") p. 37, §2.7 attached as EXHIBIT 3; excerpts of Hall Dep., June 3, 2014, pp. 84:17-85:2 attached as EXHIBIT 4.)

6.      As part of the parties' agreement, Stryker agreed to assume multiple liability risks as part of the deal it executed, which included:

(a)     Stryker's assumption of liability for any and all claims arising from hundreds of thousands of pieces of time-sensitive, medical implant products it was acquiring;

(b)     Stryker's waiver of all UCC-type warranties (including the warranties of merchantability and fitness) with respect to the acquired products; and

(c)     Stryker's agreement to indemnify and hold Pfizer harmless from all post-closing claims.

(Purchase Agreement, pp. 34-35, §2.5; pp. 50-72, Article V; pp. 74-76, §6.8; pp.126-128, Article VIII, EXHIBIT 3.)

**Stryker's Acquisition and Distribution of Stale Inventory and Resulting Claims**

7.      Stryker finalized its transaction with Pfizer in December 1998, and even though it waived all UCC-type warranties and lacked the time to conduct an audit of the massive inventory before the deal was final, Stryker sold the inventory it acquired without delay. (Excerpts of April 3, 2007 Trial Opinion, *Stryker Corp., et al., v. Nat. Union Fire Ins. Co. of Pittsburgh, PA, et al.*, No. 4:01-cv-00157-RHB (W.D. Mich. Oct. 4, 2001) ("*Stryker I*"), *Stryker I* Dkt. 916, p. 22 attached as EXHIBIT 5; excerpts of Lipes Trial Testimony, January 29, 2007, pp. 89:13-90:16

3

attached as EXHIBIT 6; excerpts of Staub Trial Testimony, January 30, 2007, p. 269:2-12 attached as EXHIBIT 7.)

8.      In fact, some of the inventory Stryker acquired (including all the knee implant products called the Duracon Unicompartmental Knee® ("DUK")) was expired (or beyond its recommended shelf life) on the date of closing. (Excerpts of Stryker's Counterclaim, Pfizer, Inc., *et al.*, v. Stryker Corp., No. 02-CIV-8613 (LAK) (S.D.N.Y. Oct. 28, 2002) ("*Pfizer Lawsuit*"), pp. 12-13, ¶¶ 40-41 attached as EXHIBIT 8.)

9.      Regardless, Stryker distributed its stale DUK inventory for implantation into patients. (Excerpts of Stryker's Counterclaim, *Pfizer Lawsuit*, pp. 12-13, ¶¶ 40-41, EXHIBIT 8; excerpts of *Stryker I* August 17, 2005 Opinion *Stryker I* Dkt. 689, p. 2 attached as EXHIBIT 9.)

10.      The stale DUK implants failed in dozens of patients shortly after implantation due to the defect and had to be removed and replaced. (Excerpts of *Stryker I* August 17, 2005 Opinion, *Stryker I* Dkt. 689,[1] p. 2, EXHIBIT 9.)

11.      Thereafter, the patients asserted claims for their injuries against Stryker alone or both Stryker and Pfizer (as the manufacturer of the DUK implants) ("Post-Closing Claims"). (Excerpts of August 17, 2005 Opinion, *Stryker I* Dkt. 689, p. 2, EXHIBIT 9; excerpts of Plaintiffs' Brief Supporting their Motion for Summary Judgment Against TIG on Remand, Dkt. 262, p. 3 attached as EXHIBIT 10.)

12.      Stryker received notice of the first Post-Closing Claim in early 2000. (Excerpts of Cartier Dep., May 30, 2014 p. 54:14 attached as EXHIBIT 11.)

---

[1] Unless otherwise indicated, citations to the record noted as "(Dkt. __)" refer to the court docket for this lawsuit, *Stryker Corp., et al., v. XL Ins. Am. Inc., et al.,* No. 1:05-cv-051 (RHB) (W.D. Mich. Jan. 20, 2005) ("*Stryker II*").

**Stryker's Insurance Program**

**The 1999-2000 Policy Period**

13.     As part of its acquisition, Stryker expanded coverage under its existing 1999-2000 liability insurance program to include the newly-acquired Pfizer Howmedica entity. (January 12, 1999 J&H Marsh & McLennan Memorandum attached as EXHIBIT 12.)

14.     The 1999-2000 insurance program was structured in layers, with Stryker assuming a self-insured retention ("SIR") for the first $2 million, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") providing the next $15 million, TIG providing the next $25 million, and other excess carriers providing an additional $165 million above TIG, for a total of $205 million of coverage above the SIR. (Stryker Corporation Historical Policies chart attached as EXHIBIT 13.)

**The 2000-2001 Policy Period**

15.     For the following policy year (2000-2001), Winterthur International America Insurance Company, now known as XL Insurance America, Inc. ("XL") replaced National Union's $15 million layer beneath TIG's layer. (Stryker Corporation Historical Policies chart, EXHIBIT 13.)

16.     Also during the 2000-2001 policy year Stryker added another $95 million of excess coverage, which brought the total coverage to $300 million above Stryker's SIR. (Stryker Corporation Historical Policies chart, EXHIBIT 13.)

**The Underlying XL Policy for 2000-2001**

17.     The 2000-2001 XL policy contained a Definition of Occurrence - Medical Products Endorsement, under which claims arising from the same product defect pronounced in

an Advisory Memorandum issued by Stryker during the 2000-2001 policy period were to be

batched into that year. (Excerpts of XL policy, policy number HFL 004-28-67-00, Endorsement

No. 15, Definition of Occurrence – Medical Products Endorsement attached as Exhibit 14.)

18.     Stryker's Advisory Memorandum regarding the DUK claims was issued on July

28, 2000. (July 28, 2000 Advisory Memorandum attached as Exhibit 15.)

**The TIG Policy for 2000-2001**

19.     The Insuring Agreement for the TIG Policy provides in relevant part:

> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all
> UNDERLYLING INSURANCE, and (2) only after all UNDERLYLING
> INSURANCE has been exhausted by the payment of the limits of such insurance
> for losses arising out of occurrences insured by all of the policies designated in
> the Declarations as UNDERLYING INSURANCE.

(TIG Policy, Exhibit 1.)

20.     The TIG Policy defines Ultimate Net Loss as "the amount of the principal

sum…actually paid or payable in cash in the settlement or satisfaction of claims for which the

insured is liable…by…compromise with the written consent of [TIG]." (TIG Policy, Exhibit 1.)

21.     According to the terms of the Policy TIG's consent is required if Stryker wants

the underlying claim settlements included in the calculation of Ultimate Net Loss under the TIG

Policy.  The TIG Policy does not exclude this consent requirement for Stryker's settlements

within the underlying policy limits if Stryker wants TIG to provide coverage for such

settlements. (TIG Policy, Exhibit 1; excerpts of June 27, 2013 Opinion, Dkt. 327, pp. 12-13

attached as Exhibit 16).  TIG's witnesses consistently confirmed this interpretation in their

deposition testimony.  For example, Marilyn Schultz, the TIG underwriter who drafted the TIG

excess liability form at issue, testified that if the settlement "is never presented to TIG for

payment, [it] doesn't care," but "if a claim were being presented to TIG to pay, then TIG has to agree to [the] settlements." (Excerpts of Schultz Dep., September 18, 2013, pp. 149:20, 128:15-17 attached as EXHIBIT 17.)  Further, a former TIG underwriter at the time, Don Bendure, was asked if "TIG had the right to consent to all settlements within the underlying layer." He testified, "Yes, if they intend to call upon TIG to participate," which he clarified as meaning "to pay." (Excerpts of Bendure Dep., December 5, 2013, p. 148:9-18 attached as EXHIBIT 18.)  (See also: excerpts of Bendure Dep., December 5, 2013, pp. 30:4-31:6, 129:12-21, 134:19-135:2, 137:17-139:14, 148:9-18, EXHIBIT 18; excerpts of Schultz Dep., September 18, 2013, pp. 70:5-11, 71:14-72:6, 128:15-130:4, 145:23-146:5, 149:14-150:6, 156:19-157:22, 161:17-162:11, EXHIBIT 17; excerpts of Slavin Dep., January 24, 2014, pp. 110:14-23, 125:14-20, 133:7-13 attached as EXHIBIT 19; excerpts of Ribble Dep., January 15, 2014, pp. 42:9-14, 44:7-45:24 attached as EXHIBIT 20; excerpts of Lameka Dep., January 9, 2014, pp. 65:12-66:16, 117:3-12, 139:12-15, 140:10-20 attached as EXHIBIT 21; excerpts of Mason Dep., December 18, 2013, p. 113:12-17 attached as EXHIBIT 22.)

22.     The TIG Policy does not impose any duty on TIG to defend or to raise coverage issues before its policy is implicated.  The TIG Policy provides: "WE shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or suit brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any occurrence which, in OUR opinion, may create liability on the part of US under the terms of the policy." (TIG Policy, EXHIBIT 1.)

23.     Further, the TIG Policy states: "WE have no duty to provide coverage under this policy unless YOU and any other involved insured have fully complied with the conditions of

this policy." (TIG Policy, Exhibit 1.)  One of the conditions sets forth Stryker's duties in the

event a "claim or suit" is brought against it – Condition F, which provides in pertinent part:

*        *        *

2.      If a claim is made or suit brought against YOU, YOU must see to it the WE receive prompt written notice of the claim or suit.

3.      YOU and any other involved insured must:

      a.      Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

*        *        *

(TIG Policy, Exhibit 1.)

**Stryker's Notice to TIG of the Post-Closing Claims and Settlements**

24.      On August 17, 2000, Stryker began giving notice of the Post-Closing Claims to

its 2000-2001 insurers.  This notice was provided via a letter directed to XL (the underlying

umbrella insurer) with TIG and Stryker's other excess insurers receiving copies. (Example

August 17, 2000 correspondence attached as Exhibit 23.)

25.      Over the course of the next two years, TIG was copied on boilerplate notices of

the claims and/or suits (including copies of the complaints) as they were asserted against Stryker

for some 75 Post-Closing Claims. (Example September 25, 2002 correspondence attached as

Exhibit 24.)

26.      However, at no point during the time the Post-Closing Claims were being

reported or settled did Stryker ask TIG to do anything or seek its consent of the settlements.

(Example August 17, 2000 correspondence, Exhibit 23; example September 25, 2002

8

correspondence, EXHIBIT 24; Baird Affidavit, September 24, 2012, Dkt. 268, Ex. A attached as EXHIBIT 25.)

27.     TIG acknowledged the notices it received and asked to be kept "updated on any pertinent developments that may implicate our policy" regarding the Post-Closing Claims.  TIG did not waive any policy term, including the consent requirement, in its communications with Stryker regarding the Post-Closing Claims. (Examples October 4, 2001 correspondence and December 19, 2000 correspondence attached as EXHIBIT 26.)

28.      In September and October of 2001, TIG also was copied on two broker reports directed to XL and National Union that attached summaries of the settlements that Stryker had reached on the Post-Closing Claims.  Based on the information TIG received in the reports, such as the number of claims that were Stryker's responsibility and the average settlement amount, Stryker's exposure for the Post-Closing Claims did not appear likely to come close to exceeding the $17 million in underlying limits. (September 27, 2001 correspondence attached as EXHIBIT 27; October 18, 2001 correspondence attached as EXHIBIT 28.)

29.     For example, the October 2001 report indicated that 70 Post-Closing Claims had been brought against Stryker as to which Stryker had been able to settle 15 for a total of $1,087,600 (approximately $72,500 per suit/claim). Assuming this settlement value the then-existing 70 Post-Closing Claims had a value of about $5 million – well below TIG's layer of coverage. (October 18, 2001 correspondence, EXHIBIT 28.)  Eventually, Stryker was implicated in 80 DUK-related claims/suits, and in *Stryker I*, this Court ruled that 75 of these Post-Closing Claims were in the "batch" defined by the July 28, 2000 advisory memorandum for purposes of triggering the 2000-2001 policies. (Excerpts of August 17, 2005 Opinion, *Stryker I* Dkt. 689, pp.

17-18, EXHIBIT 9.)  Between 2000 and 2006, Stryker settled its own liability in those 75 Post-Closing Claims for $7.6 million (approximately $100,000 per claim/suit). (List of Claim Settlements chart, *Stryker I* Dkt. 1174-2 attached as Exhibit 29.)

30.     TIG did not receive any reports or summaries related to the Post-Closing Claim settlements that were reached after October 2001 similar to the ones it received in September and October 2001.

## The Pfizer Indemnification Claim and Stryker's Failure to Inform TIG of that Claim

31.     On April 16, 2001 – during the same period of time that Post-Closing Claims were being asserted against Stryker – Pfizer tendered the defense and made a claim for indemnification against Stryker pursuant to the Purchase Agreement for the Post-Closing Claims in which Pfizer had been implicated ("Pfizer Indemnification Claim"). (April 16, 2001 correspondence attached as EXHIBIT 30.)

32.     Stryker did not communicate the Pfizer Indemnification Claim to TIG or otherwise advise or provide information to TIG of the potential liabilities it was subject to under the Purchase Agreement with regard to the Pfizer Indemnification Claim.  Those additional liabilities included interest on any Post-Closing Claim settlements or judgments incurred by Pfizer, as well as Pfizer's attorneys' fees in pursuing its indemnification claims against Stryker, together with interest on those fees. (Purchase Agreement, EXHIBIT 3.)

33.     Nor did Stryker advise TIG that it intended to categorically reject Pfizer's tender of the defense and claim for indemnification, which it did on June 29, 2001, even though the Purchase Agreement required Stryker to fully indemnify Pfizer for such claims and Stryker's General Counsel viewed its position regarding the Pfizer Indemnification Claim as a "hard

position to win on" given the terms of the Purchase Agreement. (June 29, 2001 correspondence attached as EXHIBIT 31; excerpts of Hall Dep., June 3, 2014, p. 153:7-20, EXHIBIT 4.)

34.     In addition, despite the fact that about half of the Post-Closing Claims implicated both Stryker and Pfizer, Stryker reported those claims in Status Report summaries to its insurers as Stryker's sole responsibility. (List of Claims table from Stryker's Brief in Support of Plaintiffs' Motion for Summary Judgment Against XL Insurance America, Inc., Dkt. 97, pp. 4-5 attached as EXHIBIT 32; September 27, 2001 correspondence, EXHIBIT 27; October 18, 2001 correspondence, EXHIBIT 28.)

35.     The record shows that by August 2000 Stryker knew that "140 to 150" potential Post-Closing Claims existed and that, in its estimation, would take "$250,000 or more" to resolve each of these claims – an exposure of at least $35 million. (Excerpts of Cartier Dep., May 30, 2014, p. 54:13-55:6, EXHIBIT 33; Excerpts of Hall Dep., June 17, 2008 pp.46-47 attached as EXHIBIT 34; August 13, 2001 handwritten notes attached as EXHIBIT 34-1.)

36.     Nevertheless, on October 4, 2001 Stryker filed a declaratory judgment action solely against its insurers National Union and XL (and not TIG) (*Stryker I*).  This lawsuit involved only the sums Stryker had paid, and in the future would pay, to resolve its <u>own</u> liability for the Post-Closing Claims ("Direct DUK Claims") and did not include the Pfizer Indemnification Claims. (*Stryker I* Complaint, *Stryker I* Dkt. 1 attached as EXHIBIT 35.)

37.     While Stryker has stated that it did not name TIG as a defendant in *Stryker I* because "the full amount of the claims asserted directly against Stryker, <u>by itself</u>, [did] not exceed XL's policy limits." (Excerpts of Plaintiffs' Brief Supporting their Motion for Summary Judgment Against TIG on Remand, Dkt. 262, p. 4, EXHIBIT 36 (emphasis added)), the facts show

11

that these claims account for less than half of the total Post-Closing Claims actually filed against Stryker (that is, only 37 of 75 claims) and only about a quarter of the total potential Post-Closing Claims (or 37 of approximately 140-150 claims). (Excerpts of August 17, 2005 Opinion, *Stryker I* Dkt. 689, pp. 17-18, EXHIBIT 9; Excerpts of Cartier Dep., May 30, 2014, p. 54:13-55:6, EXHIBIT 33; Excerpts of Hall Dep., June 17, 2008 pp.46-47, EXHIBIT 34.)

38.     Nevertheless, for over a year after Stryker rejected the Pfizer Indemnification Claim, Stryker continued in its position that it was not required to indemnify and hold Pfizer harmless for the Post-Closing Claims – all without a word to TIG. (Pfizer's Complaint, *Pfizer Lawsuit* Dkt. 1 attached as EXHIBIT 36.)

39.     In October 2002, the first group of joint cases, involving 29 Post-Closing Claims, went to trial in Virginia.  Before the trial concluded, a global settlement of the cases was reached, with Stryker agreeing to pay one-third of a global settlement or $3,250,000 and Pfizer agreeing to pay the balance of $6,275,000 to close the deal ("Orrik Settlement"). (Pfizer's Complaint, *Pfizer Lawsuit* Dkt. 1 EXHIBIT 36.)

40.     Stryker did not report the Orrik Settlement.

**The Pfizer Suit and Stryker's Failure to Provide TIG Key Information / Documents**

**Initiation of the Pfizer Lawsuit**

41.     On October 28, 2002, shortly after the Orrik Settlement was reached, Pfizer filed suit against Stryker in federal court in New York (the "Pfizer Litigation"). (Pfizer's Complaint, *Pfizer Lawsuit* Dkt. 1, EXHIBIT 37.)

42.     On January 8, 2003, Stryker's broker forwarded a one-page Memo regarding the Pfizer Litigation to Stryker's insurers.  The cover letter from the broker was directed to National

Union, with TIG and the other excess carriers (in the 1999-2003 policy years) noted as copy recipients.  (January 8, 2003 correspondence attached as EXHIBIT 38.)  The one-page Memo generally described Pfizer's position – that Stryker was obligated to reimburse it for Post-Closing Claims – and provided the amount of damages sought.  The Memo did not reference the fact that Pfizer's position was based on the Purchase Agreement.  The Memo, authored by Stryker's General Counsel's administrative assistant, stated in substantive part:

> On October 28, 2002, Pfizer Inc. and MTG Divestitures, Inc. (f/k/a Howmedica Inc.) (collectively, "Pfizer") filed suit against Stryker alleging, among other things, that Stryker is obligated to reimburse Pfizer for over $7.0 million in litigation expenses, including certain defense and settlement costs, "incurred as a result of third party claims arising from alleged injuries" due to the implantation of expired Duracon Uni-Knees sold after December 4, 1998.  In addition, Pfizer alleges that Stryker is obligated to reimburse or pay on behalf of Pfizer all judgments, awards, liabilities, losses, or settlements or other amounts which they become legally obligated to pay as a result of any third party claim for injury allegedly due to the use of a product" sold after December 4, 1998.  The suit has been filed in the U.S. District Court for the Southern District of New York.

(January 8, 2003 correspondence, EXHIBIT 38.)

43.     Stryker failed to provide TIG with a copy of Pfizer's complaint against it, as had been done with the Post-Closing Claims implicating Stryker. (January 8, 2003 correspondence, EXHIBIT 38.)

44.     Within days of receiving the one-page Memo, TIG requested a copy of the Pfizer complaint, as well as the Purchase Agreement and Stryker's defense counsel reports. (January 16, 2003 claim handler remarks attached as EXHIBIT 39; January 14, 2003 correspondence attached as EXHIBIT 40; January 16, 2003 correspondence attached as EXHIBIT 40.)  However, there is no indication in the record that TIG received any of these materials from Stryker or Marsh until after this lawsuit was filed in 2005. (Bruett Affidavit, July 30, 2014 attached as

EXHIBIT 41.)   In fact, TIG did not receive a copy of the Purchase Agreement (without attachments) until March 2005 or a copy of Pfizer's complaint (without exhibits) until 2007. (March 29, 2005 correspondence attached as EXHIBIT 42; Document Production correspondence attached as EXHIBIT 46.)   To date, TIG has not received copies of Stryker's defense counsel communications related to the Pfizer lawsuit, which have been withheld by Stryker on privilege grounds.  (Excerpts of Stryker's privilege log attached as EXHIBIT 43.)

45.   Pfizer's complaint contained information not disclosed in the one-page Memo.  In particular, the allegations in Pfizer's complaint recapped the Stryker-Pfizer dispute to date and included the following facts:

(a)   Both Stryker and Pfizer were implicated in numerous DUK suits, including some 29 cases in Virginia involving Post-Closing Claims ("the Orrik litigation").

(b)   Under Section 2.5(c) of the Purchase Agreement, Stryker assumed "all liability for claims by third parties arising from the use or application of a product of Business sold after the Closing."

(c)   Under Section 8.2 of the Purchase Agreement, Stryker agreed to indemnify and hold Pfizer harmless for "all such claims, losses, costs or damages" arising from such claims.

(d)   Stryker had "declined Pfizer's tender of defense and claim for indemnification" for the post-Closing cases in a letter dated June 29, 2001, claiming that "the products in question should never have been conveyed to Stryker and, therefore, are not covered by Section 2.5(c) and Article VIII [Section 8.2] of the Agreement."

(e)   On or about October 8, 2002, the plaintiffs in the Orrik litigation agreed to a settlement and that "[n]otwithstanding the fact that twenty-nine of the [] Duracon Uni-Knee lawsuits consolidated in the Orrik litigation were post-Closing cases, Stryker agreed to contribute only a small portion of the settlement amount," requiring the balance to be paid by Pfizer.

(f)   Stryker has refused to defend, indemnify or hold Pfizer harmless with respect to other DUK lawsuits beyond those at issue in the Orrik litigation.

14

(g)     As a direct result of Stryker's breach of the Purchase Agreement, Pfizer "ha[s] incurred and will incur in the future, significant expense, including attorneys' fees and costs, in connection with enforcing the right to indemnification under the Agreement, including attorneys' fees and costs incurred in bringing the instant action."

(h)     Under the Purchase Agreement's terms, Stryker is obligated to indemnify Pfizer "by reimbursing them in full for all liabilities, losses, costs or damages incurred in post-Closing Uni-Knee lawsuits as well as all litigation expense incurred in connection with this matter."

(Pfizer's Complaint, *Pfizer Lawsuit* Dkt. 1, EXHIBIT 37.)

46.     Further, Pfizer's complaint included two counts – one for declaratory judgment and another for breach of contract.  The prayer for relief requested damages for breach of contract in the amount of $7,543,000, plus additional damages to be proven at trial and pre-judgment interest at the statutory rate.  Pfizer also sought relief in the form of a declaration holding Stryker liable for its defense and indemnification obligations with respect to future claims, including defense expenses and costs, together with all attorneys' fees, costs and expense incurred in connection with its efforts to enforce Stryker's indemnification obligations in the Pfizer Litigation. (Pfizer's Complaint, *Pfizer Lawsuit* Dkt. 1, EXHIBIT 37.)

**Initial Proceedings / Discovery in Pfizer Lawsuit**

47.     After filing its complaint, Pfizer obtained a default judgment against Stryker after Stryker failed to timely respond to the complaint. (Default Judgment, *Pfizer Lawsuit* Dkt. 6 attached as EXHIBIT 44.)

48.     The New York court later set the $7.6 million default judgment aside, after Stryker agreed to drop a suit against Pfizer it filed in federal court in New Jersey. (Docket report, *Pfizer Lawsuit* attached as EXHIBIT 45.)

49.     Thereafter the following key documents were filed by the parties in the Pfizer lawsuit:

(a)     February 14, 2003 – Stryker's Answer and Counterclaim for Declaratory Judgment and Damages (Docket report, *Pfizer Lawsuit*, EXHIBIT 45);

(b)     March 7, 2003 – Pfizer's Reply to Stryker's Counterclaim (Docket report, *Pfizer Lawsuit*, EXHIBIT 45);

(c)     March 14, 2003 – Pfizer's Amended Complaint (Docket report, *Pfizer Lawsuit*, EXHIBIT 45);

(d)     March 17, 2003 – Stryker's Amended Counterclaim (Docket report, *Pfizer Lawsuit*, EXHIBIT 45);

(e)     March 27, 2003 – Stryker's Answer to Pfizer's Amended Complaint (Docket report, *Pfizer Lawsuit*, EXHIBIT 45); and

(f)     April 3, 2003 – Pfizer's Reply to Stryker's Amended Counterclaim (Docket report, *Pfizer Lawsuit*, EXHIBIT 45).

None of these legal papers were provided to TIG until the parties exchanged discovery in the instant lawsuit.  (Document Production correspondence, EXHIBIT 46.)

50.     In the months after Stryker's amended counterclaim was filed, Pfizer and Stryker exchanged and conducted discovery in the Pfizer Litigation. (Docket report, *Pfizer Lawsuit*, EXHIBIT 45.)

**Summary Judgment Phase in Pfizer Lawsuit**

51.     On December 2, 2003 Stryker's outside counsel sent a status report to Stryker's primary umbrella carriers' counsel, which provided those insurers with the following information:

(a)     Pfizer was continuing to resolve Post-Closing Claims in which it was implicated.

(b)     As of September 12, 2003, Pfizer's reported losses for Post-Closing Claims amounted to $11.0 million.

16

(c)     Pfizer's losses increased after it suffered adverse jury verdicts in two additional group cases involving Post-Closing Claims (Galzerano (4 cases) and Bartlett (3 cases)).  These adverse verdicts totaled an additional $6.9 million – an average of about $1 million per case.

(d)     On November 4, 2003, Stryker and Pfizer filed cross motions for summary judgment and briefs in the *Pfizer Lawsuit*.

(e)     A court-ordered settlement conference was scheduled for December 16, 2003 before the federal Magistrate.

This report concluded by noting:

> Although we understand that both of your clients have denied coverage – and have refused to defend and indemnify Stryker or HOC – for any of the Duracon Uni-Knee claims, including those at issue in the Pfizer litigation, we are providing this update out of an abundance of caution.  Stryker believes that the above-referenced policies sold to Stryker by your clients provide coverage for the amounts Pfizer may recover against Stryker in the Pfizer Litigation.

> In addition to the above amounts awarded or agreed to in resolving claims against Pfizer and its subsidiaries, Stryker agreed to pay plaintiffs in the four [sic] Galzerano cases $400,000 and plaintiffs in the three Bartlett cases $350,000 in settlement of claims against Stryker and its subsidiaries.

(December 2, 2003 correspondence (attached as Exhibit D to Stryker's Complaint filed January 20, 2005, Dkt. 1-5) attached as EXHIBIT 47; Pfizer's and Stryker's summary judgment motions and supporting briefs, *Pfizer Lawsuit* attached as EXHIBIT 37.)

52.     TIG was not copied on the December 2, 2003 report.  Nor did TIG receive any information related to the Pfizer Litigation activities outlined in it, including the summary judgment briefs. Additionally, TIG was not advised that the underlying carriers had refused to defend and indemnify Stryker regarding the Post-Closing Claims, which was referenced in this report.  Nor was TIG advised that in the cases involving both Stryker and Pfizer as defendants, Stryker was not obtaining full releases when it settled those claims. Unbeknownst to TIG,

17

Stryker was settling its liability only in those joint Post-Closing Claims, leaving Pfizer to settle or litigate its own liability in those Claims. (December 2, 2003 correspondence, EXHIBIT 47.)

53.     In fact, TIG did not receive the December 2, 2003 report until May 2, 2005 when it was served with Stryker's Complaint, which attached the report as Exhibit D.  (December 2, 2003 correspondence, EXHIBIT 47).  However, around the time of the December 2, 2003 report Stryker knew that any liability incurred by Pfizer regarding the Post-Closing Claims could ultimately become its responsibility.  As Stryker's General Counsel (Curtis Hall) testified, "[Pfizer] had manufactured the products, but under the terms of the Agreement, unless [Stryker] could shift all of that burden back to Pfizer, we were getting stuck with those liabilities… ." (December 2, 2003 correspondence, EXHIBIT 47; excerpts of Hall Dep., June 17, 2008, p. 50:10-14, EXHIBIT 34; Purchase Agreement, pp. 34-35, 74-76, 126-128, EXHIBIT 3.)

54.     Further, at the time of the December 2, 2003 report, Stryker had spent $6,887,784 to resolve its own liabilities in the Post-Closing Claims. (List of Claim Settlements chart, *Stryker I* Dkt. 1174-2, Exhibit 48.)  Collectively, Pfizer and Stryker had incurred a combined $18 million in settlements or judgments related to Post-Closing Claims. (December 2, 2003 correspondence, EXHIBIT 47.)  In addition to these liabilities, as Stryker's counsel noted in the December 2, 2003 report, Stryker knew it was also potentially liable for "fees and costs in the Pfizer Litigation" and prejudgment interest on all sums it would owe Pfizer. (December 2, 2003 correspondence, EXHIBIT 47.)

55.     Despite Stryker's knowledge of its incurred and potential liabilities relating to the Post-Closing Claims (as evidenced by its counsel's December 2, 2003 report), Stryker limited the information it provided to TIG during this time period to: (i) boilerplate notices of the Post-

Closing Claims implicating Stryker (along with related claim or suit papers); (ii) the September and October 2001 settlement summaries related to the Post-Closing Claims; and (iii) the one-page January 2003 Memo regarding the Pfizer Litigation. (December 2, 2003 correspondence, EXHIBIT 47.)  But none of these materials indicated the Post-Closing Claims might exceed the TIG Policy's attachment point of $17 million. (Example August 17, 2000 correspondence, EXHIBIT 23; example September 25, 2002 correspondence, EXHIBIT 24; September 27, 2001 correspondence, EXHIBIT 26; October 18, 2001 correspondence, EXHIBIT 27; January 8, 2003 correspondence, EXHIBIT 38.)

**Summary Judgment Entered Against Stryker in Pfizer Lawsuit**

56.     On November 24, 2004 the Southern District Court of New York entered an order granting summary judgment in Pfizer's favor and against Stryker with regard to Stryker's liability for the Post-Closing Claims.  (*Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131 (S.D.N.Y. 2004) attached as EXHIBIT 49.)

57.     Stryker's outside counsel first advised the underlying umbrella insurers on December 6, 2004 of the adverse summary judgment ruling in the Pfizer lawsuit.  Counsel's letter noted that Pfizer had established as a matter of law that Stryker was "required to indemnify and defend Pfizer for losses which it suffered in connection with [the DUK] claims arising from implants sold after [the closing date], and to reimburse Pfizer for its attorneys fees in the Pfizer Litigation."  The letter further noted that counsel expected Pfizer's damages "could exceed $18 million." (December 6, 2004 correspondence attached as EXHIBIT 53.)

58.     The December 6, 2004 letter from counsel was sent to TIG on December 15, 2004 – nearly two years after TIG received its last communication from Stryker with regard to

the Post-Closing Claims (the one-page January 8, 2003 Memo discussed above).  The cover letter to TIG advised, "both National Union and [XL] have already [sic] notified of this matter", but it did not indicate that both underlying carriers denied coverage for the Post-Closing Claims. (December 15, 2004 correspondence attached as EXHIBIT 50.)

59.    On December 28, 2004, Stryker's outside counsel asked James Hopson of Marsh to "provide prompt notice to all of Stryker's excess carriers, from 1999 to date, of recent developments in this case that may trigger coverage under some or all of those policies," noting that this was an update to a letter dated January 8, 2003 (nearly two years prior) "to those carriers" regarding the Pfizer Litigation. (December 28, 2004 correspondence attached as EXHIBIT 51.)

60.    On January 18, 2005, Mr. Hopson sent a letter to National Union with copies to the excess insurers, including TIG, enclosing Stryker's counsel's December 28, 2004 report. TIG received that communication on January 21, 2005 – after Stryker filed this lawsuit. (January 18, 2005 correspondence attached as EXHIBIT 52.)

**Stryker's Counsel's Post-Lawsuit Communications with TIG's Claims Department**

61.    On January 20, 2005 Stryker filed the instant lawsuit against XL and National Union for coverage based on the Pfizer Indemnification Claim and TIG for any DUK-related loss in excess of that coverage. (Dkt. 1.)

62.    In the four months following the filing of this lawsuit, but before TIG was served with the summons and complaint or otherwise advised of this lawsuit, Stryker's outside counsel engaged TIG's claims department in a series of communications, requesting TIG's coverage

position on the Pfizer Indemnification Claim and TIG's attendance at an upcoming mediation

with Pfizer. (See example communications discussed below.)

63. On February 3, 2005 Stryker's outside counsel sent a letter to TIG regarding the

Pfizer claim.  In particular, Stryker's counsel advised:

> Last week you called me in response to my January 25, 2005 letter to Mr. Patrick
> Denning [of TIG] (a copy is enclosed).  You told me, on behalf of TIG, you had
> requested additional information about this case from Mr. James Hopson of
> Marsh… .  In the future, please forward any requests for information directly to
> me.  You asked that I send a copy of the Winterthur policy for the year 2000.  A
> copy is enclosed.  You also told me that TIG would make no commitment
> concerning coverage, will not attend any mediation, and is reserving its rights.
>
> The mediation that was previously scheduled for February 7 will now take place
> later in the month.  Prior to the mediation, we would like to know TIG's position
> on coverage.  We would also like TIG to let us know whether it consents to
> Stryker's participation in the mediation for the purpose of attempting to settle the
> referenced action.  If we do not hear from you by the close of business (5 p.m.) on
> February 15, we will assume that TIG consents to Stryker's participation in the
> mediation for that purpose.

(February 3, 2005 correspondence attached as EXHIBIT 54.)

64. TIG received counsel's letter on February 9, 2005 and responded the next day.

TIG's four-page letter directed to Stryker's counsel raised many questions regarding the Pfizer

Indemnification Claim and how it might impact the TIG Policy.  Further, TIG indicated that it

was "not in a position to state [its] coverage position since we need additional information as to

the claims and the positions of the carriers under TIG."  Based on this lack of information, TIG

declined to provide Stryker with its consent to participate in a mediation to resolve the Pfizer

Litigation.  TIG also requested thirteen items it needed to assess coverage including: (i) a copy of

the complaint in the Pfizer Litigation; and (ii) a copy of the Purchase Agreement.  The letter

concluded by stating, "Upon receipt of this information we will further analyze our position.  In

21

the interim, we continue to reserve our rights under the policy." (February 10, 2005 correspondence attached as EXHIBIT 55.)

65.     TIG's February 10, 2005 request to Stryker for information including the Pfizer complaint and Purchase Agreement was TIG's third request to Stryker for these two particular documents.  TIG's prior requests occurred in January 2003 and again in January 2005. (January 16, 2003 correspondence and January 25, 2005 correspondence attached as EXHIBITS 38 and 56, respectively.)  The January 2005 request to Marsh also indicated "[a]t this time TIG has insufficient information to make any coverage determination and reserves its rights under the policy." (January 25, 2005 correspondence, EXHIBIT 56.)

66.      On March 29, 2005 Stryker's outside counsel provided to TIG most of the information requested in TIG's February 10, 2005 correspondence.   (March 29, 2005 correspondence, EXHIBIT 42.)

67.     On April 22, 2005 the Southern District Court of New York entered a judgment in favor of Pfizer and against Stryker for $17.7 million, consisting of $12.8 million for indemnity (plus $2.2 million interest) and $2.3 million in attorneys' fees (plus $.4 million interest).  (April 22, 2005 Judgment, *Pfizer Lawsuit* attached as EXHIBIT 57.)

68.     On May 2, 2005 TIG was served with Stryker's complaint. (Dkt. 6.)

Respectfully submitted,

Dated: July 31, 2014          By:      _____/s/ Mary E. Fechtig_____
                                       Mary E. Fechtig
                                       Beth A. Stroup
                                       CARROLL MCNULTY & KULL, LLC
                                       100 North Riverside Plaza, Ste. 2100
                                       Chicago, IL 60606

(312) 800-5000
mfechtig@cmk.com
bstroup@cmk.com

-and-

Carole D. Bos
BOS & GLAZIER, P.L.C.
990 Monroe Avenue N.W.
Grand Rapids, MI 49503
(616) 458-6814
cbos@bosglazier.com

*Attorneys for Defendant – TIG Insurance Company*