UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION and
HOWMEDICA OSTEONICS CORP.,

        Plaintiffs,

                                      Case No.  1:05-CV-51

v.

                                      HON. ROBERT HOLMES BELL

XL INSURANCE COMPANY, INC.,
f/k/a Winterthur International America
Insurance company, and TIG INSURANCE
COMPANY,

        Defendants.

_____/

# O P I N I O N

       This matter comes before the Court on cross-motions for summary judgment filed by Stryker Corporation and Howmedica Osteonics Corporation (jointly referred to as "Stryker") and by TIG Insurance Company ("TIG").  (ECF Nos. 497, 501.)  For the reasons that follow, Stryker's motion for summary judgment will be granted, and TIG's motion for summary judgment will be denied.

## I.

       Stryker makes and markets medical supplies.  (Supp. Compl. ¶ 2, ECF No. 363.)  In 1998, Stryker purchased the stock and assets of Howmedica, Inc. from Pfizer, Inc. Howmedica was the manufacturer of the Duracon Unicompartmental Knee ("Uni-Knee").

1

In 2000, Stryker began receiving product liability claims regarding defective Uni-Knees.

For the year 2000, Stryker had commercial liability insurance through XL Insurance Co., Inc. ("XL") and excess insurance through TIG.  The underlying XL policy included a $2 million self-insured retention ("SIR") followed by $15 million of coverage by XL.  TIG's attachment point was $17 million.

Stryker tendered the claims arising out of defective Uni-Knees to XL.  XL declined to defend or indemnify Stryker for the Uni-Knee claims.  In 2001, Stryker sued XL for defense and indemnification for the Uni-Knee claims against Stryker.  *Stryker Corp. v. XL Ins. Am., Inc.*, No. 1:01-CV-157 (W.D. Mich.) ("*Stryker I* "). Between 2000 and 2006, but primarily in between 2001 and 2003, Stryker settled the direct Uni-Knee claims on its own and paid over $7.6 million from its own resources to settle the claims.   Following the trial in *Stryker I*, this Court determined that XL was liable for Stryker's direct settlements.

During this time period, Pfizer, as the parent corporation of Howmedica, was also receiving product liability claims relating to defective Uni-Knees.  Pfizer filed suit against Stryker in the Southern District of New York for indemnification for Uni-Knee claims that arose after Stryker purchased Howmedica. *Pfizer, Inc. v. Stryker Corp.*, No. No. 02 Civ.8613 (S.D. N.Y.) ("*Pfizer*").  On December 2, 2004, the New York court ruled that Stryker was liable to Pfizer for indemnification for all losses relating to the Uni-Knees sold after December 4, 1998.  *Pfizer*, 348 F. Supp. 2d 131, 159 (S.D. N.Y. 2004).

In 2005, Stryker filed this action against XL and TIG, seeking damages against XL

for breach of contract, a declaration that XL was obligated to defend and indemnify Stryker in the *Pfizer* action, and a declaration that TIG was obligated to cover any losses from *Stryker I* and *Pfizer* that were not covered by XL. *Stryker Corp. v. Nat'l Union Fire Ins. Co.*, No. 1:05-CV-51 (W.D.Mich.) ("*Stryker II*"). Stryker noted that the damages in *Pfizer* might exceed $18 million.

In 2009, this Court held a settlement conference in *StrykerI*, *Stryker II*, and *Pfizer v. Stryker*. (ECF Nos. 164, 165.) TIG made an appearance, but did not actively participate in any substantive discussions based on its position that the TIG policy did not provide coverage for any of the matters at issue in the three cases. (Betz Decl. ¶ 3, ECF No. 280.) Following that conference, XL settled with Pfizer and paid Pfizer over $17 million in settlement of the *Pfizer* liability judgment. By settling the *Pfizer* judgment, XL exhausted its policy limits.

The cases associated with the insurance disputes regarding the Uni-Knee claims have a complicated procedural history.[1] However, for purposes of this opinion, the issue is limited to whether TIG is liable for Stryker's direct settlements of the Uni-Knee claims.

The reasonableness of the Stryker settlements is not in dispute. Following trial in *Stryker I*, this Court found that Stryker's settlements of the direct Uni-Knee claims were reasonable. *Stryker I*, No. 4:01-CV-157 (Dec. 15, 2008, Op. 3, ECF No. 1055.) In this case,

---

[1]The history of these cases is set forth in detail in the following Sixth Circuit opinions: *Stryker Corp. v. XL Insurance America*, 735 F.3d 349 (6th Cir. 2012) ("*Stryker I Appeal*"); *Stryker Corp. v. National Union Fire Insurance Co. of Pittsburgh, PA*, 681 F.3d 819 (6th Cir. 2012) ("*Stryker II Appeal*"); *Stryker Corp. v. XL Insurance America*, 576 F. App'x 496 (6th Cir. 2014).

TIG has agreed not to contest whether the settlements reached in the underlying Uni-Knee cases brought against Stryker were reasonable and does not contest whether the settlements were negotiated in good faith.  (ECF No. 448.)  Based on TIG's stipulation, this Court has found that the settlements in the underlying Uni-Knee cases brought against Stryker (listed on Exhibit A to the Stipulation) are reasonable, good faith settlements.  (ECF No. 452.)

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

Where the moving party also bears the burden of persuasion at trial, the party's "initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001); *see also* 11 Moore's Federal Practice § 56.40[1][c], at 56-1111-12 (3d ed. 2014) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence.").

## III.

The parties have filed cross-motions for summary judgment.  Stryker contends that TIG is liable for reimbursing Stryker for its settlements and TIG contends that there is no coverage for Stryker's claims under the TIG Policy.  Despite the long and convoluted legal history of the related Stryker Uni-Knee cases, the issue before this Court – whether the TIG Policy covers Stryker's direct settlements – is relatively straightforward.  Stryker purchased commercial liability insurance from XL and excess insurance from TIG.  Stryker became liable for claims associated with the Uni-Knees Stryker purchased from Pfizer.   Stryker's losses included the direct settlements Stryker entered into when XL refused coverage and the judgment against Stryker in *Pfizer*.  Both Stryker's direct settlements and the *Pfizer* judgment are losses covered by the XL policy.  The losses exceeded the limits of the XL policy.  XL

paid the judgment in the *Pfizer* case, exhausting XL's policy limits.  Because the underlying insurance has been exhausted, Stryker has turned to TIG, its excess carrier, for reimbursement for its direct settlements.  There is no suggestion that the settlements were collusive or otherwise unreasonable.  Nevertheless, TIG has refused to pay.

Despite the seemingly straightforward nature of Stryker's claim, TIG contends that Stryker's claim is not covered because Stryker did not obtain TIG's consent before entering into the $7.6 million in direct settlements and because Stryker did not give adequate notice of its dispute with Pfizer.  Stryker seeks summary judgment in its favor on the grounds that the TIG policy did not require Stryker to obtain TIG's consent before entering into the settlements, because TIG's notice claim is not properly before the Court, and because TIG's notice claims lacks merit.

Michigan law governs the substantive issues in the case.  *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 681 F.3d 819, 823 (6th Cir. 2012).  In determining whether an insured is entitled to insurance benefits, Michigan courts apply a two-part test:  "'First, we determine if the policy provides coverage to the insured. If it does, we then ascertain whether that coverage is negated by an exclusion.'"  *Tooling, Mfg. & Technologies Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670-71 (6th Cir. 2012) (quoting *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 510 (Mich. 1995)).  "[T]he insured has the burden to demonstrate that its claim falls within the terms of the policy."  *Id.* at 671(citing *Heniser*, 534 N.W.2d at 510).

In construing an insurance policy under Michigan law, the Court "'must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction.'" *Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc*., 730 N.W.2d 682, 685 (Mich. 2007) (quoting *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999)). "'The primary goal in the construction or interpretation of any contract is to honor the intent of the parties.'" *Klapp v. United Ins. Grp. Agency, Inc*., 663 N.W.2d 447, 456 (Mich. 2003) (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)).

The Michigan Supreme Court has identified the following principles to aid in the interpretation of insurance contracts:

> First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written where there is no ambiguity.

*Tooling Mfg.*, 693 F.3d at 670 (quoting *Citizens v. Pro–Seal*, 730 N.W.2d at 685).

## A. CONSENT REQUIREMENT

The Court turns first to the parties' dispute over whether the settlements are covered by the TIG Policy. The TIG policy provides for coverage as follows:

> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of occurrences insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the

7

exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

(TIG Policy § I(A) Coverage.)

There is no dispute that the XL insurance has been exhausted, nor is there any dispute that Stryker is seeking insurance of losses arising out of occurrences insured by XL. However, the parties disagree as to whether Stryker's settlements fall within the TIG Policy's definition of ULTIMATE NET LOSS.  The definition at issue is the following:

> ULTIMATE NET LOSS means the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of **claims for which the insured is liable**, either **by** adjudication or **compromise with the written consent of US**, after making proper deduction for all recoveries and salvages.

(TIG Policy § III(B) Definitions (emphasis added).)

TIG contends that Stryker is not entitled to coverage because the definition of ULTIMATE NET LOSS limits TIG's obligations to settlements it has consented to, and it has not consented to Stryker's settlements.  TIG does not claim that it was harmed or prejudiced by Stryker's failure to obtain its consent.  According to TIG, whether it was harmed by Stryker's failure to provide it with the opportunity to consent to the settlements is not germane to the coverage analysis.  TIG contends that the language of the contract is a sufficient basis for finding that it does not have liability because under Michigan insurance law it is not required to show prejudice for a loss that does not fall within the policy's coverage language.  *See Detroit Water Team Joint Venture v. Agricultural Ins. Co.*, 371 F.3d 336, 341 (6th Cir. 2004)  (holding that an insurer is not required to prove prejudice for a loss

8

not falling within the policy's insuring agreement); *Tenneco, Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 870 (Mich. Ct. App. 2008) (enforcing, without a showing of prejudice, a "no action" clause that barred any action against the insurer unless the amount of the insured's obligation was determined by trial or by settlement with the insurer's written consent).

In response, Stryker does not contend that TIG needs to show prejudice. Instead, Stryker contends it is entitled to judgment either because the policy only requires consent to settlements within TIG's policy layer, Stryker's liability has been adjudicated, request for consent would have been futile, or consent was unreasonably withheld. Stryker also contends that even if the TIG policy did require prior consent to settlements made within the underlying policy layer, TIG waived the requirement or is estopped from raising it.

1. Is the TIG Policy Ambiguous?

The parties' dispute as to whether the TIG policy requires TIG's prior consent for the settlement of all claims, or only claims within TIG's policy layer, raises the question of whether, as Stryker contends, the TIG policy contains a latent ambiguity as to the meaning of the term "claims."

> A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the "necessity for interpretation or a choice among two or more possible meanings." To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic

9

evidence again to ascertain the meaning of the contract language at issue.

*Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (citations and footnotes omitted). The latent-ambiguity doctrine, which has a long history in Michigan law, enables courts "to ascertain and carry into effect the intention of contracting parties." *Id.* at 641-42.

Consent provisions are common in excess policies. However, as TIG agrees, the facts of this case are unusual. (TIG Resp. at 8 n.5, ECF No. 528.) What is unusual about this case is the combination of the following factors: (1) XL wrongfully failed to provide coverage for Stryker's direct settlements, (2) Stryker entered into the direct settlements before the XL policy limits were exhausted, and (3) XL subsequently exhausted its limits by settling the later *Pfizer* judgment before paying the Stryker direct settlements.[2]

Stryker contends that the term "claims" in the consent provision should be construed to apply only to claims within TIG's policy layer, and not to claims within the underlying insurer's policy layer. Former TIG claims adjusters who worked on the Stryker claims uniformly testified that TIG did not require its consent for settlements of claims that were within the underlying layer of insurance because TIG had no interest in claims that did not reach its policy layer. They testified that TIG did not have an interest in any settlements that

---

[2]Although the payment of the *Pfizer* judgment before the Stryker settlements was not anticipated, it was not wrongful. *See Stryker I Appeal*, 735 F.3d at 356-57, & n.3 (rejecting Stryker's argument that XL could not apply the Pfizer settlement to exhaust the XL policy prior to addressing the direct claims against Stryker, and noting that "the general rule is that an insurer may pay claims in any order it chooses").

were within either the Stryker's self-insured retention or the XL layer of insurance. (Mulkey Dep. 47, 92, 115, 128-29; Lameka Dep. 65-66; Slavin Dep. 110; Couch Dep. 62.) The only time TIG would want to be involved in settlements was if they involved amounts that TIG might be called upon to pay, i.e., settlements that would be in TIG's layer of coverage. (Lameka Dep. 66.) Claims adjuster Lameka testified that the consent provision means the insured needs TIG's consent for settlements where TIG would have to pay. (*Id.* at 140.) TIG never requested that it be allowed to consent to settlements that, when made, did not require any payment by TIG. (*Id.* at 139.) Claims adjuster Geller testified that "Stryker was free to settle the lawsuits when XL denied coverage, as long as it did not impact the TIG policy." (Geller Dep. 55.) Claims adjuster Slavin agreed that "as long as Stryker was settling those claims within the 15 million [dollar] XL limits, TIG would not be concerned about those settlements." (Slavin Dep. 110). As long as Stryker was not spending TIG's money, it would not need to have any consent or input into those settlements that were within the XL limits. (*Id.*)

Stryker's insurance expert's testimony was consistent with that of the TIG employees. He testified that he never encountered a circumstance where an excess carrier required consent to settlements of claims which, when made, fell entirely within the underlying carrier's layer of coverage. (Cormack Dep. 54.) Even Schultz, TIG's excess underwriter, agreed that "our TIG policy does not state that it has to give its approval" for settlements within layers below the TIG level. (*Id.* at 72.) "If the suit is never presented to TIG for

payment, they don't care." (*Id.* at 149 .)  TIG agrees that a primary carrier does not need the consent of an excess carrier in order to settle a claim within the primary limits,  even if the total claims might later reach the excess layer.  As Schultz testified, TIG was not interested in the settlements that were "within and paid by" the underlying insurer.  (*Id.* at 129.)   She testified that "if a claim were being presented to TIG to pay, then TIG has to agree to settlements." (*Id.* at 128.)

Here, the Stryker settlements were entered into within the XL policy limits, but, because XL wrongfully denied coverage, they were not immediately paid by XL.  When XL subsequently learned that it was liable, it payed the *Pfizer* judgment first, thus forcing Stryker to present the claims long after they were made to TIG for payment.  This is uncharted terrain.  Stryker's expert could not recall a single case in his 49 years of experience in the insurance field where a claim that was settled within an underlying layer was later presented to an excess carrier for payment.  (Cormack Dep. 54.)  Neither party has identified any case law that has examined whether an excess carrier's consent provision applies to a settlement that was entered into before the underlying insurance was exhausted.  TIG agrees that the facts of this case are unusual.  (TIG Resp. 8, n.5.)

The Court concludes that the contract language is contradictory under these unique circumstances.  On the one hand, the policy, as interpreted and applied by TIG's own employees, does not require TIG's consent to settlements entered into below the TIG layer, but, on the other hand, the policy does require consent if those settlements are offered to TIG

for payment. The term "claims," as used in the definition of Ultimate Net Loss, is ambiguous under the circumstances of this case; it is susceptible to more than one interpretation. Because a latent ambiguity exists, the Court must examine the extrinsic evidence to ascertain the intent of the parties under the circumstances presented.

2.  How Should the Ambiguous Policy be Construed?

"The practical interpretation given to contracts by the parties to them, while engaged in their performance and before any controversy has arisen concerning them, is one of the best indications of their true intent." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 459 (Mich. 2003) (quoting *People ex rel Attorney Gen. v. Michigan Central R. Co.*, 108 N.W. 772, 781 (Mich. 1906)). The practical interpretation given to the contract by the parties is that, under normal circumstances, Stryker would not have an obligation to seek TIG's consent to settlements that were within the XL layer of insurance when they were entered into. It is evident, however, that the parties did not anticipate the unusual circumstances of this case where underlying insurer wrongfully refused coverage, thus requiring the insured to settle the claims, and then paid off a later adjudication before the earlier settlements, thus requiring the insured to present the settlements made in the lower layer to the excess insurer. This case requires the Court to determine who should bear the risk of XL's erroneous denial of coverage and its unexpected action in paying off the later Pfizer judgment before the earlier Stryker settlements. For the following reasons, the Court finds that it is better to place the risk of this unanticipated development on TIG rather than on Stryker.

13

### a. *Construe Ambiguities Against The Insurer*

First, it is "well established" under Michigan law that "ambiguous language should be construed against the drafter, i.e., the insurer." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 787 (Mich. 2003); *see also Stryker I Appeal*, 735 F.3d at 356 (noting that "ambiguities in an insurance policy must be construed in favor of coverage and against the insurer"); *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 857 (Mich. Ct. App. 2008) ("If an ambiguity in the contract cannot be resolved, it should be strictly construed against the drafter.") Construction of the TIG policy against TIG means that Stryker is not required to obtain consent for its direct settlements because Stryker settled the claims within the XL layer of insurance.

### b. *Meaningless Act*

Second, requesting TIG's consent would likely have been a meaningless act. The TIG policy provides that "[i]f any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, the WE shall not pay such loss." (TIG Policy § I(A) Coverage.) Before Stryker entered into the settlements, XL, the underlying insurer, had denied coverage. Based on the TIG policy's coverage language, XL's denial meant that TIG would also deny coverage. TIG's employees agreed that the denial of Stryker's claim by XL essentially operated as a denial by TIG as well because TIG's policy was a "follow form" policy. (Couch Dep. 78-79; Bendure Dep. 155; Lameka Dep. 130-31; Slavin Dep. 84.) If XL denied a claim, TIG would not do an independent

evaluation about whether the TIG policy provided coverage. (Couch Dep. 78.)  The Court is reluctant to place the burden on Stryker to seek TIG's consent for a settlement when coverage had already been denied by the underlying insurer, because to do so would likely have been futile.  *See Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir. 2007) (The law does not require the doing of a futile act.").

*c.  Purposes of the Consent Provision*

Third, requiring Stryker to obtain TIG's consent to settlements entered into with XL's policy layer is not inconsistent with the purposes of the consent provision under the facts of this case.  The evidence is undisputed that TIG had no interest in involving itself in settlements that were within XL's layer.  Clauses prohibiting the insured from voluntarily settling a claim without the insurer's consent give the insurer the opportunity to contest liability, to participate in settlement negotiations and to have input as to the value of the claim."  *Alyas v. Gillard*, 446 N.W.2d 610, 613 (Mich. Ct. App. 1989).  They serve the purpose of allowing the excess insurer to control the settlement decisions that involve the excess insurer's payment of money.  (Cormack Dep. 53-54.)  The undisputed testimony, however, is that TIG had no interest in getting involved in the Stryker settlements.

Even if TIG was not aware that XL had denied coverage, the undisputed testimony is that TIG's claims adjusters had no interest in settlements within XL's layer of insurance. When TIG received the Stryker claims, they opened a claim file, found no apparent exposure for TIG, and closed the file the same day.  (Lameka Dep. 58, 64; Pl. SJ Br. Ex. O.)  This

practice meant that no adjuster was assigned to the file, no independent investigation was undertaken, and no follow up was scheduled on the file. (Lameka Dep. 58, 88-89, 106.) The file was not being monitored. (Couch Dep. 58.) In evaluating the Stryker claims, the TIG employees did not consult the provisions of the XL policy, nor did they understand the meaning of batch coverage. (Mulkey Dep. 16, 27; Lameka Dep. 52, 117, 120-21; Couch Dep. 46-47; Ribble Dep. 59-60.) This is significant because TIG viewed each Stryker claim as an individual claim for a failure of a knee implant, and concluded that the damages on any of the individuals would not likely get to TIG's layer because there was a $2 million SIR and $15 million of coverage underneath. (Lameka Dep. 84.)

Upon receiving the claims, TIG did request Stryker to "please ensure the above-mentioned adjuster is updated on any pertinent developments that may implicate our policy in this loss." (Moffat Claim File, Def. Ex. 26; Martin Claim File, Def. Ex. 27; Mulkey Dep. 40-41.) This request did not shift the burden of monitoring the claims from TIG to Stryker. Although the TIG Policy placed specific notice obligations on Stryker, it did not place on Stryker a general duty to update TIG on developments that "might implicate" TIG's policy. Keeping track of TIG's potential exposure was not Stryker's obligation. Other than this form letter, TIG did no follow up on the Stryker claims. (Mulkey Dep. 41.)

Stryker did not keep its settlement of these claims a secret from TIG. Stryker mentioned in a number of the claim notices it sent to TIG that Stryker was involved in settlements. (*See e.g.*, Brickman Claim File, Def. Ex. 23; Custer Claim File, Pl. Ex. E, p.

16

100; Ednie Claim file, Ex. E, p. 127; Moffat Claim file, Ex. E, p. 444.)  On September 27, 2001, Stryker sent TIG a copy of Stryker General Counsel Curtis Hall's letter to XL, which included a list of claims filed against Stryker, a list of claims filed against Pfizer, and the status of settlements that had been entered into to date.  (Pl. Summ. J. Br. Ex. Q.)  Stryker sent TIG an updated and more detailed report of the status of claims and settlements on October 18, 2001:  "We have received 70 uni-knee lawsuits and claims to date and have settled 15 of these matters for a total pay out of $1,087,600.43 (approximately $72,500 per suit/claim)."  (Pl. Summ. J. Br. Ex. R.)  Despite being informed of these settlement efforts, TIG did not ask for additional information about the settlements or demand to be provided an opportunity to consider the reasonableness of any future settlements.  TIG did not express any interest in the settlements.  Claims adjuster Mulkey testified that, if asked, he would have given consent to the settlements because they were within Stryker's self-insured retention or the XL layer.  (Mulkey Dep. 128.)  TIG would only take an interest if the insured was asking TIG to spend money.  (Mulkey Dep. 129.)  Claims adjuster Lameka was aware of at least one of Stryker's attempts to settle a claim, but she did not have any interest in being involved in any settlement that Stryker might make because she did not see any exposure to the TIG policy.  (Lameka Dep. 65.)  She did not require consent to settlements within an underlying layer, because if TIG was not going to write the check, she could "care less."  (*Id.* at 117.)  Claims adjuster Slavin agreed that Stryker was free to enter into the $7.5 million in settlements without seeking TIG's consent because they were well within XL's limits.

(Slavin Dep. 133.) If Stryker had sought TIG's consent for the settlements, it is highly unlikely that TIG would have requested an opportunity to get involved in the settlements. Because TIG had no interest in the settlements, the purposes of the consent requirement would not have been met by requiring Stryker to seek TIG's consent.

*d. Avoiding a Windfall*

Fourth, if the consent requirement is construed to apply to settlements which, when entered into, were within the XL layer, Stryker, who paid for excess insurance, will not obtain the benefit of its bargain, and TIG, who was paid to provide excess insurance, would avoid a paying on a risk that its policy was designed to cover. The Court is not suggesting that TIG was at fault for XL's erroneous decision not to provide coverage. However, if TIG is not required to pay, it will experience a windfall. What bumped the Stryker direct settlements into the TIG layer was XL's settlement of the Pfizer adjudication before the Stryker direct settlements. Had XL not wrongfully denied coverage, XL, rather than Stryker, would have paid the settlements, and TIG would not have insisted on consenting to those settlements. After paying the settlements, XL would have paid the subsequent *Pfizer* judgment, and TIG would have been liable for the excess of the *Pfizer* judgment after the XL policy was exhausted. There would have been no need for TIG's consent to the settlements of Stryker claims because they were in XL's layer, and there would have been no need for

18

TIG's consent to the *Pfizer* judgment because it was adjudicated.[3]   Accordingly, holding Stryker to the consent requirement for its direct settlements that were entered into in the XL layer would give TIG a windfall.

*e.  No Good Faith Basis for Withholding Consent*

Finally, when Stryker did eventually request TIG's consent to the settlements, TIG refused consent without providing a reasonable basis for doing so. "Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v. City Nat. Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975)(citing 3A Corbin, Contracts, § 644, pp. 78-84.)  An excess insurer cannot arbitrarily withhold its consent to a reasonable settlement.  *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 277 Cal. Rptr. 906, 916 (Cal. Ct. App. 1991).

In January 2014, in response to an interrogatory from Stryker asking if TIG consented to Stryker's settlements, TIG responded:  "TIG did not previously and does not now consent to the settlements of the underlying claims identified on Exhibit A." (Stryker Ex. CC, Answ. to Interrog. 10.)  TIG further stated that this was the first time Stryker had requested TIG's consent, that the request was untimely, and that a request for consent is inappropriately stated as an interrogatory and legally ineffectual.  (*Id.*)

---

[3]The parties agree that the consent requirement in the definition of Ultimate Net Loss qualifies settlements only, and not adjudications.

The Policy provides that Ultimate Net Loss means the amount paid in the settlement of "claims for which the insured is liable . . . by . . . compromise with the written consent" of TIG.  (TIG Policy § III(B).)  Contrary to TIG's assertions, the Policy language does not require Stryker to obtain TIG's consent prior to entering into a settlement.  The Policy says nothing about when consent must be obtained.  Nothing in the Policy would prevent TIG from giving its consent after the fact.  Accordingly, timeliness is not a valid basis for refusing consent.  There is also no dispute in this case that the settlements Stryker seeks coverage for were reasonable.  TIG has presented testimony that even if a settlement appeared to be reasonable, TIG might still deny consent based on the surrounding circumstances.  (Ribble Dep. 44-45.)  However, TIG has not identified any surrounding circumstances that would have justified TIG's failure to consent to the Stryker settlements.  TIG has offered no evidence of any good faith basis for denying consent to the settlements.

In conclusion, the Court finds that the operation of the consent requirement under the unique facts of this case is ambiguous.  The Court further finds that the extrinsic evidence suggests that the consent requirement should be construed in a manner that does not bar coverage under these unique facts.  The Court concludes that TIG is not entitled to avoid liability based on the consent provision.

## B.  NOTICE OF PFIZER SUIT

TIG contends that the Court should alternatively grant its motion for summary judgment because Stryker breached Condition F. of the TIG Policy by failing to provide it

with prompt notice and documentation of the Pfizer indemnification claim and pleadings from the *Pfizer* litigation, resulting in a lost opportunity for TIG to associate in that claim and suit.

> Condition F. provides in pertinent part:
>
> 2.     If a claim is made or suit brought against YOU, YOU must see to it that WE receive prompt written notice of the claim or suit.
>
> 3.     YOU and any other involved insured must:
>
>      a.     Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

(TIG Policy, § IV(F).)

TIG contends that Stryker failed to promptly notify TIG of the Pfizer indemnification claim made against Stryker by letter dated April 16, 2001, failed to provide TIG with a copy of that demand letter, and failed to provide copies of the pleadings filed in the *Pfizer v. Stryker* suit.

Stryker objects to TIG's arguments concerning notice of the Pfizer claim and litigation because TIG did not properly plead the defense, and because TIG did not raise the defense until May 30, 2014, nine years after this case was filed, and six weeks before the close of discovery.

Rule 9(c) of the Federal Rules of Civil Procedure provides that "when denying that a condition precedent has occurred or been performed, a party must do so with particularity." *See E.E.O.C. v. Serv. Temps Inc*., 679 F.3d 323, 333 (5th Cir. 2012) (holding that Rule 9(c)

"requires that a party must deny the occurrence or performance of a condition precedent, with particularity, in the operative pleadings"). In its answer to Stryker's Supplemental Complaint, TIG did not allege with particularity that Stryker failed to give timely notice of the Pfizer claim. Of the 17 affirmative defenses asserted by TIG, only the fourth one is arguably broad enough to cover the issue of inadequate notice of the Pfizer claim and litigation. TIG's fourth affirmative defense states:

> The claims are barred to the extent Plaintiffs failed to comply with any condition of the TIG Policy, which policy provides that TIG "has no duty to provide coverage under the Policy unless [the insured] ha[s] fully complied with the conditions of this Policy."

(Answ. Suppl. Compl., ECF No. 372, PageID #5313.) Stating that claims are barred "to the extent" that they failed to comply with "any" condition of the TIG Policy is not a denial of the performance of a condition precedent "with particularity." Earlier in the case TIG had included an affirmative defense that Stryker breached "one or more conditions precedent to coverage including, but not limited to, the duty to provide timely and adequate notice of all claims and suits and the duty to cooperate." (ECF Nos. 7, 66, 82, Affirm. Defense ¶ 8.) However, this notice similarly lacks particularity.

TIG contends that it was not required to comply with Rule 9(c) because Stryker did not plead compliance with all conditions precedent as it was required to do under Rule 9(c).

Rule 9(c) provides that in pleading conditions precedent, "it suffices to allege generally that all conditions precedent have occurred or been performed." Fed. R. Civ. P. 9(c). Stryker alleged that it "timely notified XL and TIG about the *Pfizer v. Stryker* lawsuit."

22

(Supp. Compl. ¶ 34, ECF No. 363.)  This notice was sufficient to trigger TIG's duty to deny performance of the condition precedent with particularity.  TIG failed to do this.  TIG merely responded that the allegations contained "legal conclusions to which no response is required."  (Answ. to Supp. Compl. ¶ 34, , ECF No. 372.)

In addition, when Stryker specifically asked TIG to identify its basis for denying coverage, TIG answered on March 3, 2014, that "beyond its contention that there is no coverage because the underlying Uni-Knee Settlements do not constitute Ultimate Net Loss under the TIG Policy, TIG currently believes that it has a defense based on rescission of contract." (Pl. Ex. JJ, Answ. to Interrog. 15.)  It was not until May 30, 2014, that TIG supplemented its answers to interrogatories to state that it now believed that it had an additional defense to coverage "based on Stryker's failure to comply with the policy conditions set forth in Section IV of the TIG Policy," as set forth in more detail in the expert report of Olie R. Jolstad.  (Pl. SJ Ex. GG.)  Mr. Jolstad's report is dated May 16, 2014.  (Def. Resp. Ex. C.)

TIG has articulated no good reason for its failure to discover this defense earlier.  TIG had the means for discovering this defense when this suit was filed in 2005.  There is great prejudice and no justification for bringing it into the lawsuit at this late date.  For this reason alone, the Court will deny TIG's Pfizer notice defense.

Even assuming the defense is properly before this Court, the Court finds no merit to it.  It is a red herring.  Stryker is not seeking coverage for the *Pfizer* judgment from TIG.  The

*Pfizer* judgment has been paid by XL.  Stryker is only seeking coverage for the claims it settled.  Most of Stryker's settlements were entered into before the *Pfizer* action was even filed.  Whether Stryker gave timely notice of the Pfizer indemnity claim or provided copies of pleadings filed in the *Pfizer* suit is tangential at best to the issues in this case.

Moreover, even to the limited extent the *Pfizer* case might be relevant to TIG's obligations in this case, the evidence does not support TIG's claim that Stryker's failures warrant a denial of coverage.

> Ordinarily, one who sues for performance of a contractual obligation must prove that all contractual conditions prerequisite to performance have been satisfied.  However, it is a well-established principle that an insurer who seeks to cut off responsibility on the ground that its insured did not comply with a contract provision requiring notice immediately or within a reasonable time must establish actual prejudice to its position.

*Koski v. Allstate Ins. Co.*, 456 Mich. 439, 444, 572 N.W.2d 636, 639 (1998) (citing *Weller v. Cummins*, 47 N.W.2d 612 (Mich. 1951); *Wendel v. Swanberg*, 185 N.W.2d 348 (Mich. 1971). *Koski*'s prejudice requirement is limited to contractual provisions requiring notice immediately or within a reasonable time rather than a fixed time period.  *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 817 N.W.2d 504, 514 (Mich. 2012).  The TIG Policy fits squarely within *Koski* because it requires the insured to provide "prompt" notice and to "immediately" send copies of documents.

TIG correctly notes that there is no evidence that Stryker gave TIG notice of Pfizer's April 2001 indemnification letter, or that Stryker sent TIG copies of the *Pfizer* suit pleadings.  Nevertheless, TIG has not shown that it was prejudiced by these alleged failures of notice.

24

Stryker did give TIG prompt notice of the *Pfizer* suit.  Stryker notified TIG of the *Pfizer* suit on January 8, 2003, although it was not served with the complaint until January 16, 2003. (Pl. SJ Ex. T; Pl. Resp. Ex. R.).  The memorandum attached to the notice advised TIG that Pfizer had sued Stryker for over $7 million for defense and settlements costs associated with Uni-Knee claims and for additional amounts which they might become obligated to pay.  On December 15, 2004, Stryker sent TIG an update on the *Pfizer* litigation, indicating that summary judgment had been entered in favor of Pfizer and that Pfizer's losses could exceed $18 million.  (Pl. SJ Ex. U.)  On January 18, 2005, Stryker provided further notice of the status of the Pfizer litigation as well as the *Stryker I* litigation in this Court.  (Pl. SJ Ex. V.) On January 25, 2005, Stryker informed TIG of the February 7, 2005, mediation  scheduled in the *Pfizer* case.  (Pl. SJ Ex. W.)  TIG responded on January 31, 2005, that it would not attend the mediation because it had insufficient information to make a coverage determination, and stated that it was reserving its rights under the policy.  (Pl. SJ Ex. X.)

Today TIG complains that Stryker's failure to notify TIG of a Pfizer indemnification claim made in 2001 and Stryker's failure to send TIG copies of documents filed in the *Pfizer* case violated Stryker's notice obligations under the Policy and resulted in a lost opportunity to associate regarding the Pfizer claim and suit.

TIG's claim fails as a matter of law.  TIG's policy provides that TIG "shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suit relative to any occurrence which, in [TIG's] opinion, may create liability on the part of

25

[TIG] under the terms of this policy." (TIG Policy § 1(C)(1).) Stryker had been notifying TIG of the multiple claims that had been filed against both Stryker and Pfizer. Stryker also notified TIG that more than $7 million was at stake in the *Pfizer* suit. Even after receiving notice that liability had been determined and that the issue of damages would be mediated, TIG made no effort to get involved in either the settlements or the *Pfizer* suit. TIG is a sophisticated party. Its policy gave it the right to inspect Stryker's property and operations and to examine and audit its books and records. (TIG Policy § IV(G).) The notice TIG received from Stryker included sufficient information to enable TIG to decide whether or not to obtain further information, and whether or not to involve itself in the defense of the *Pfizer* litigation. TIG had the resources to determine whether, in its opinion, the *Pfizer* suit might create liability on the part of TIG. Although Stryker may not have provided all of the information it was required to provide under the policy or in the time frame TIG would have desired, TIG did very little to protect its own interests. TIG's choice to wait on the sidelines may be a reasonable decision on the part of an excess insurer, but it was TIG's choice, and it was not caused by Stryker's alleged failure to provide Pfizer's indemnification letter or its failure to forward the pleadings from the *Pfizer* suit.

Because TIG's Pfizer notice claim is late, because it has little relevance to the issues in this case, and because TIG has not shown prejudice from any late notice, the Court concludes that TIG is not entitled to the late notice defense.

**IV.**

For the reasons stated in this opinion, the Court finds that Stryker is entitled to reimbursement for its Uni-Knee settlements, and that TIG does not have a defense to coverage.  Accordingly, Stryker's motion for summary judgment on the issue of liability will be granted, and TIG's motion for summary judgment will be denied.


Dated: <u>October 30, 2014</u>                    /s/ Robert Holmes Bell
                                                                      ROBERT HOLMES BELL
                                                                      UNITED STATES DISTRICT JUDGE